(47 Misc. Rep. 498.)

### KELLY v. ASHFORTH et al.

(Supreme Court, Special Term, New York County. June, 1905.)

TRUSTS—CREATION OF TRUSTS—VALIDITY—FIDUCIARY RELATIONS.

    Plaintiff's intestate was an uneducated laborer, but of ordinary business capacity, who by thrift and economy had accumulated considerable property, which he invested in real estate through defendant's brother, and afterwards through defendant. In his old age plaintiff's intestate

executed a trust deed, transferring $25,000 worth of securities bearing 5 per cent. interest to a trust company, which was to pay the income, less commissions, to plaintiff's intestate during his life, and after his death to his wife for her life, when $20,000 of the principal was to be paid to defendant, who guarantied the income to be realized from the trust fund, and the remaining $5,000 to relatives of the wife of plaintiff's intestate. This deed was drawn by the attorneys of the trust company from directions given by defendant; but it was read over carefully and its effect explained by the attorneys to plaintiff's intestate, and, while defendant paid the attorney's bill, no threats, undue influence, or fraud of any kind were proven. The income was paid over regularly to plaintiff's intestate until his death. The latter had a regard for defendant and his brother, and attributed his profitable investments to them. *Held*, that the relations between defendant and plaintiff's intestate were not fiduciary in their nature, and there was no ground for setting aside the trust deed.

Action by Margaret Kelly, individually and as administratrix of Duncan Kelly, deceased, against Edward Ashforth and others. Judgment for defendants.

Richard T. Greene, for plaintiff.

Baker & Peabody (Charles A. Peabody and Henry W. Taft, of counsel), for defendant Ashforth.

Turner, Rolston & Horan, for defendant Farmers' Loan & Trust Company.

George S. Mittendorf, for defendants McGibney.

LEVENTRITT, J. This is an action brought by the plaintiff, individually and as administratrix of the estate of her husband, Duncan Kelly, to set aside a trust deed made by him. The outcome of the litigation depends upon the conclusion to be drawn from undisputed facts. The plaintiff's claim is that the defendant, Edward Ashforth, took advantage of the influence which, through business relations, he had acquired over Duncan Kelly to obtain the trust deed which she seeks to cancel.

Duncan Kelly was born in 1827. He was a laborer, and, though he never enjoyed the advantages of an education, he could read and write to a limited extent and was possessed of ordinary capacity in everyday affairs. Through increase in wages and close economy, he accumulated sufficient to purchase the tenement house No. 521 West Forty-Third street, in this city. George Ashforth, a real estate agent and broker, the brother of the defendant Edward Ashforth, advised and effected the purchase of the property and collected the rents for Kelly for a number of years, and until 1890, when George Ashforth died. Kelly and his wife lived in one of the four-room apartments. They took care of the property and attended to the demands of the tenants. George Ashforth collected the rents, deducted the usual commission, and paid over the balance to Kelly. That was the sum total of their relations. Upon the death of George Ashforth, Edward Ashforth, the main defendant, succeeded to his brother's real estate business. Theretofore he had for a period of 19 years been employed in the Chemical Bank in this city, occupying various positions of trust and confidence. He met Duncan Kelly, who to that time had been a stranger to him, and continued the arrangement that had existed during his brother's lifetime; that is to say, he collected the rents of the Forty-Third street

property, charged the customary commission, and accounted to Kelly for the balance. This course continued until January, 1893, when Kelly sold the house, because he was unable longer to attend to it by reason of lameness resulting from an accident. The sale was made for $16,-500; Kelly accepting in part consideration a bond secured by a purchase-money mortgage payable on January 5, 1898, in the sum of $10,-000, bearing interest at 5 per cent. per annum. The attorneys, who prepared the mortgage and who had at times theretofore represented Ashforth, sent it after record to him, and he kept it for custody in his safe. In October, 1893, Kelly invested through Ashforth $15,000 in a 5 per cent. first mortgage on certain premises, worth $24,000, located on Park avenue in this city. This mortgage matured on October 26, 1896. The same course was pursued with reference to it as with the former one. Until 1896 Ashforth made the semiannual collections of interest on the two mortgages, which remained in his possession, rendered statements thereof to Kelly, and, after deducting an agreed commission, held the balance subject to Kelly's order. Kelly would call at Ashforth's office and demand and receive the balance as required. The net amount realized annually by Kelly was $1,218.75. This method of collecting and paying over the interest continued until terminated by the execution of the trust deed and the assignment of the mortgages to the Farmers' Loan & Trust Company. The transactions recited constitute all the dealings between the defendant Ashforth and Kelly up to that time.

In November, 1896, Ashforth consulted the attorneys of the Farmers' Loan & Trust Company and submitted to them the terms of the proposed trust deed, in accordance with which it was drafted and transmitted to him. With the trust company Ashforth had had previous dealings, but with the attorneys he was unacquainted. The deed was subsequently revised, pursuant to suggestions made by Ashforth. On November 11, 1896, Ashforth and Kelly, who was then 69 years of age, called at the office of the firm of attorneys of the trust company, were introduced by the head of the firm to Mr. Frederick Geller, a junior member, to whom the deed was handed, and who was instructed to attend to its execution. While assignments of the two mortgages were being prepared Geller "read over carefully" and "explained the legal effect" of the deed, because, as Geller testified, "Kelly was an illiterate man, and I wanted to be sure that he knew what he was going to sign." After explaining the contents of the papers, Geller, accompanied by Kelly and Ashforth, went to the office of the Farmers' Loan & Trust Company, where the trust deed in duplicate and the assignments of the mortgages were executed and acknowledged. One of the originals of the typewritten deed was delivered to Kelly. By its terms Kelly transferred to the Farmers' Loan & Trust Company the two bonds and mortgages to secure together the payment of $25,000 and interest thereon at the rate of 5 per cent. per annum; the income thereof, less 1½ per cent. commission to the trust company, was to be paid to Kelly during his life, and then to his wife during her life; thereafter $20,000 was to be paid to Ashforth or his heirs, and the remaining $5,000 to the defendants Elizabeth and Jane McGibney, or their survivor, and in the event of the death of both to the children of their sister Mary. Ashforth on

his part guarantied that the annual income payable to Kelly or to his wife should never be less than $1,218.75. Geller was the only counsel present at any time from the beginning to the end of the interview. The trust company's attorneys rendered the bill for their services to Ashforth, and he paid it.

At the time of the execution of the deed Kelly had no living relatives. Elizabeth and Jane McGibney are daughters of a cousin of the plaintiff. For years, at intervals, they had assisted the plaintiff in her household duties, and were dependent on their own labors for a livelihood. When the deed was executed they were each over 50 years of age. Since George Ashforth's boyhood Kelly had known him, and to the Ashforth brothers he gave credit for his profitable investments and increased means. Regularly after November 11, 1896, and until his death on August 30, 1904, the Farmers' Loan & Trust Company remitted to Kelly the full income of the two mortgages, less the agreed commission; the total net amount annually being $1,231.25. Ashforth never met either Elizabeth or Jane McGibney until the day of the funeral of Duncan Kelly. The plaintiff was duly appointed administratrix of the goods, chattels, and credits of Duncan Kelly, and in that capacity, as also individually, she instituted this action to set aside and to declare null and void the deed of trust and to obtain the surrender and assignment to her of the two bonds and mortgages. She based her individual right upon the plea that she had earned and owned one-half of the money invested, but as she offered no evidence in support thereof her individual claim must be dismissed. There remains for consideration her alleged cause of action as administratrix. The death of Kelly precluded all testimony by Ashforth explanatory of the circumstances, conversations, and events which preceded and led up to or which attended the execution of the trust deeds, and as a result the meager facts detailed must control this controversy. It is upon these that the plaintiff bases the charge that through "undue influence, fraud, and threats" Ashforth obtained the trust deed. The trial did not disclose a suggestion of a threat, or any evidence of undue influence or fraud, except such as the plaintiff seeks to spell out from the relations which existed between Kelly and Ashforth and from the mental superiority of the latter over the former. The plaintiff contends that their relations were fiduciary, and that hence it devolved upon Ashforth to establish the fairness and good faith of the transaction; and, failing in that contention, she insists that, by reason of the contrast between the shrewdness and business experience of Ashforth and the weakness and inexperience of Kelly, Ashforth must show that it was an honest deal.

The legal principles which here apply to the case at bar are succinctly summarized in the recent case of Doheny v. Lacy, 168 N. Y. 213, 61 N. E. 255. Discussing the claim there urged by the plaintiff that the existence of confidential business relations throws upon the defendant the burden of proving the fairness and validity of the contract, Judge Gray, in an opinion concurred in by all the judges, says:

"That rule, within the cases, requires as a basis for its application that a fiduciary relation exist between the parties, which will give to the one, in legal presumption, a controlling influence over the other. Such would be the relation of parent and child, guardian and ward, trustee and cestui que trust, phy-

sician and patient, and attorney and client. In these confidential relations, the situation of the parties is regarded as unequal, and as conferring upon one a certain control, or domination, over the will, conduct, and interests of the other. Transactions between them are therefore scrutinized closely, and presumptions arise of their impropriety, which must be met where an advantage is derived by the presumably dominant party. Sears v. Shafer, 6 N. Y. 268; Nesbit v. Lockman, 34 N. Y. 167; Cowee v. Cornell, 75 N. Y. 91, 31 Am. Rep. 428; Matter of Smith, 95 N. Y. 522. The presumption is one born of a relation of parties, which would create a situation of more or less dependence by one upon the other. Smith v. Kay, 7 H. L. Cas. 771. While in the relations instanced this rule is generally applied, it is also extended to other relations of trust, confidence, or inequality; but its application will then demand some previous proof of the trust and confidence, or of the superiority on one side and of the weakness on the other. The law will not presume it from the ordinary relations between persons in the business world or in the family connection. The question as to parties so situated is a question of fact, dependent upon the circumstances in each case. Cowee v. Cornell, 75 N. Y. 91–101, 31 Am. Rep. 428. Most of the business relations between persons, in a sense and to a degree, rest upon confidence reposed by the one in the other. Without it the commercial dealings of the community would be seriously restricted. But the common-law presumption of impropriety or of unfairness was not intended to reach such cases, or any cases except those where the circumstances have created what the law regards as a fiduciary relation, and where, as a safer general assumption, it regards one as the stronger party, and therefore as bound, in every transaction with the other, to establish affirmatively its good faith and propriety." 222, 223, 168 N. Y., 61 N. E. 258.

In the case at bar the relations were not fiduciary in their nature. They were those merely of real estate broker and client, with a degree of intimacy which had grown up through a lapse of years and flowing from the successful management of Kelly's real estate matters by Ashforth and the confidence which Kelly had learned to repose in Ashforth's judgment and honesty. Their relations were simply those which ordinarily exist between the real estate owner and the agent who have become well acquainted with each other. It is true that Kelly was not the mental equal of Ashforth; that he was comparatively deficient in education and experience. But the question is, did Kelly fully and clearly understand the terms of the deed of trust, the disposition that he was thereby making of his property, and who was getting the benefit of it, and, above all, did it express his voluntary intention? Though 69 years of age, there is no suggestion of impairment of mental powers. In fact, I am convinced that he thoroughly comprehended the scheme of the trust deed and that it accorded with his purpose and wishes. The only possible doubt which could arise is by reason of the apparent inequality between the return which Ashforth was ultimately to receive and the risk which he ran under the provision of the trust deed. He guarantied, in effect, that so long as either Duncan or Margaret Kelly lived their income should be 5 per cent. on the $25,000 mortgage investment, and in consideration of such guaranty he would acquire upon the death of the survivor $20,000, four-fifths of $25,000. Even bearing in mind that Ashforth assumed the risk of a probable reduction in the rate of interest, of tax charges, and the like, his return was disproportionate to the risk. But that fact, standing alone, does not lead my mind to the inference that the bargain expressed in the trust deed was improperly brought about. The scheme of the deed, viewed in the light of the circumstances, is so consistent with the whole course of Kelly's life that its provisions bear the impress of his uninfluenced desire and

intention. An assured income for himself and his wife for the remainder of their days was his natural aim. He had not a relative in the world, and was not concerned about the ultimate disposition of his capital, except to see it go to Ashforth, who by advice and assistance helped him acquire it, and to a minor degree to the McGibneys, who had come to the relief of his wife when she was struggling with the care of the tenement house and her household duties. It was quite natural that, after Kelly had secured from Ashforth a guaranty of a satisfactory fixed income for life for himself and his wife, he should be willing that Ashforth and the McGibneys should enjoy the capital.

Two minor points deserve consideration. The $15,000 mortgage had matured shortly before the execution of the trust deed. The $10,000 purchase-money mortgage would mature in 14 months. The uncertainty of the manner and form of reinvestment may well have weighed on Kelly's mind and been an element in his desire to secure certainty of income at all hazards. Secondly, the McGibneys were total strangers to Ashforth until after Kelly's death. The provision affecting them must therefore have been Kelly's voluntary suggestion, and points the argument that the whole deed was similarly expressive of his will. It is to be noted that the trust deed was prepared by reputable attorneys, who were strangers to Ashforth; that their representative, Mr. Geller, read it over carefully to Kelly, and explained its terms and legal effect to him before execution. Kelly had one of the duplicates of the deed, lived for nearly eight years after its execution, regularly received the income direct from the Farmers' Loan & Trust Company, and was never known to make an objection of any kind. There is no room for the inference that he did not fully understand the transaction and fully acquiesce in the course of procedure resulting therefrom. I am of the opinion that the execution of the deed was the expression of his unhindered, voluntary act, and that he intended and contemplated its legal effect. There should be judgment for the defendants.

Judgment for defendants.