White v. White.

---

PATRICK WHITE and SARAH DALY and husband

v.

JOHN P. WHITE et ux.

[Submitted February 17th, 1900. Decided February 23d, 1900. Filed November 17th, 1900.]

A voluntary conveyance by an illiterate man, unaccustomed to business transactions, of substantially all his property, in making which he did not have the benefit of independent, competent and disinterested counsel, to make him fully understand, realize and appreciate the full practical effect and consequence of the deed during his lifetime, though he was told gener

ally that it conveyed the property, and which contains no provisions to effect the understanding of the parties that he was to retain the use and benefit of the property during his life, will be set aside.

On final hearing on bill, answer, replication and proofs taken in open court.

*Mr. Alan H. Strong,* for the complainants.

*Mr. Silas D. Grimstead,* for the defendants.

PITNEY, V. C.

The object of this bill is to enjoin an action of ejectment brought by the defendant John P. White against the complainant Sarah Daly to recover possession of a house and lot situate on the northerly side of Bishop street, near the corner of George street, in the city of New Brunswick, and to set aside a deed of conveyance which is the foundation of the defendant's title, made and executed by the complainant Patrick to the defendant John P. White, bearing date May 8th, 1888, conveying the premises in question, which constitute the homestead of Patrick White, where he had lived for many years and reared his family, and still lives with Mrs. Daly.

The ground of relief set forth in the bill is that the complainant Patrick, at the time of the execution of the deed was advanced in years—being seventy-four years old—nearly or quite blind, entirely illiterate, so that he could neither read nor write, quite unaccustomed to business transactions, and was not conscious of having executed any such deed; that no demand had ever been made for the possession of the premises for the eleven years that intervened between its date and the commencement of the action of ejectment; that the same was procured from him by some sort of undue influence or fraudulent imposition, and that its existence was concealed from all members of the family of Patrick White. The bill further alleges that the deed, though entirely without consideration, was absolute in its terms and in the nature of a testamentary disposition, and should have contained a power of revocation on the part of the grantor.

The answer denies any and all fraudulent practice or imposi-

tion, and alleges that the deed was the free, voluntary and in- telligent act of the complainant, and that the reason why no claim was made under it and its existence concealed by defend- ant was that his father desired and expressly requested that the defendant John should not mention it while Patrick lived, and that he, John, allowed his father to remain in possession of the house and premises *"as had been arranged and agreed upon at the time of the execution of the said deed."*

This admission in the answer was in accordance with the actual facts as they appeared at the hearing, and upon it, in addition to the allegation of imposition upon the complainant, counsel based an attack upon the deed because it did not at all reserve a life estate to the grantor.

The complainants Sarah Daly and husband are joined as parties complainant because in the year 1898 the complainant Patrick White, and his wife, since deceased, conveyed the prem- ises in question to a third party, who re-conveyed them to Patrick and his wife and Sarah Daly, to hold as joint tenants.

Patrick purchased the premises in question from Isaac Fisher by deed dated December 26th, 1848. Later on, by deed dated April 3d, 1866, he purchased a lot of land called the Commercial avenue property, from certain persons of the name of Coffee, the conveyance of which was made to him and his wife, Ann, as tenants of the entirety. Later on—in 1884—a conveyance was made by one Stubelbein to Ann White, the wife of Patrick, of a lot of land situate on the corner of Bishop and George streets, immediately adjoining the homestead, which he pur- chased of Fisher.

Some time about that date—1884—the old gentleman became totally blind from cataracts covering both eyes. Of this blind- ness he was partially relieved by an operation made on the 12th of April, 1887, which gave him partial sight in one eye. so that he could recognize large objects, and move about and feel his way by the use of a cane, and was able for a while to go out and walk about the streets. But the covering over the eye soon re- turned, and within a year or two he became again almost totally blind.

He had three children—Michael, the oldest, the defendant

John, about forty-five years of age, and the complainant Sarah. John was and is a rather intelligent and pretty well educated person, so that he maintained the position of clerk in the post-office for many years. He lived at home and paid a small sum —$3 per week—for board, until his marriage in June, 1887, after which he left home and kept house seven blocks away, on George street. At that time there was ill-feeling between him and his mother and sister, which continued for a year or more.

The daughter, Sarah, had for years before that time worked out as a dressmaker, receiving wages at the rate of $1.50 a day, as often as she got work, all of which she turned into her parents.

The mother was the more active and efficient manager, and, after her husband was disabled, engaged in some small pursuits which brought in something.

The daughter married in September, 1887, and lived with her husband in a part of the homestead, paying a small rent therefor, and assisting her mother, as she became disabled by age, in the cares of her household, and also in caring for her father; and finally, for several years prior to the commencement of the suit in question, she was obliged to take care of both of them, the father having arrived at the age of over eighty, with many infirmities; the same being true of the mother, who died in 1898.

The father was sworn, de bene esse, at his house, before the day set for the hearing, and was unable to attend as a witness at the hearing to explain any matters that were advanced against him. He swears that he went with John to a house in New Brunswick, there met two other men, and executed a will, and that he subsequently executed a codicil; that he never executed any deed; that John made him execute the will. He did, in fact, execute both the deed in question and a will, both at one sitting, in the presence of his son John, Mr. Grimstead, who prepared the documents, and Captain Hoffman, a resident of New Brunswick.

The account of the transaction given by the defendant John P. White, Captain Hoffman and Mr. Grimstead is as follows:

John swears that his father told him that he had been induced by his mother to make a will that did not suit him, and that he wished to assure to him (John) the homestead so that it would always be occupied by a White, and requested him (John) to

White *v.* White.

procure a lawyer to prepare the papers, and that he wished to keep it very quiet; that he was not aware at that time what kind of papers his father wished to execute; that in pursuance of his request he visited Mr. Grimstead in the evening at his house in Rahway, twelve miles away, but did not tell him that a deed was contemplated, and made an appointment for him and Captain Hoffman to meet at the house of Mrs. Ryan, a near neighbor of John's, at a certain hour on the 8th of May, 1888. This, it will be perceived, was less than a year after John was married and left home, while the bad feeling existed between him and his mother and sister. Neither Grimstead nor Hoffman were friends or acquaintances of Patrick. Hoffman was on rather intimate terms with John. That they met at Mrs. Ryan's according to appointment; that his father came to his (John's) house, and brought with him the Fisher deed of the homestead, but no other deed; that they went from there to Mrs. Ryan's, and there met Mr. Grimstead and Captain Hoffman; that there the father produced the deed and took the initiative; told Mr. Grimstead what he wished—that he wished to fix the title to the homestead in John, so that it could not be taken away from him. Mr. Grimstead asked him if he wanted to make a deed for it, and that he said he did. Mr. Grimstead had with him a blank deed, and a supply of legal cap paper; that he drew the deed from the old deed brought by his father, explained it fully to the old gentleman, and that the latter executed it by his mark and acknowledged it in his presence, and in the presence of Mr. Hoffman. The deed is produced, and is so executed. The pen work of Patrick's signature to both deed and will was done by Grimstead in the usual way, namely, the old gentleman touched the top of the pen while Grimstead made the mark.

Mr. Grimstead swears that after the deed was executed the old gentleman said that he had other property that he wanted to dispose of, and he asked him if he wished it to be done by deed; that he said, "No," a will would do; that he then stated what other property he had, and that he then and there prepared a will, which is produced. It was executed in the presence of the same witnesses, and witnessed by them. By that will he gives

the property purchased of Stubelbein, on the corner of George and Bishop streets, to his wife, Ann. (It will be observed that the title to this was vested already in Ann White, and never had been vested in the testator.) He then gave to his daughter, Sarah, the complainant, the lot of land on Commercial avenue purchased by him of the Coffees. (This property, it will be borne in mind, belonged at that time to him, the testator, and his wife, as tenants of the entirety, and his power to dispose of it depended upon his surviving his wife.) He then gave to his son Michael $25, declaring that he had advanced to him money to an amount equal to the property given to his daughter, Sarah. Then the will recites that he had this day given his son John a deed for the lot of land on Bishop street which he bought of Isaac Fisher, and declared that he intended that to be in lieu of any interest which he, said John, should have in any estate of which he might die seized. Then all the rest and residue of his estate, both real and personal, and there was no proof that there was any other property, of which he might die seized, he gave to his executors to be divided into three parts, one-third to his wife, one-third to his daughter, Sarah, and one-third to his son John; and declared that the bequest to his wife was intended to be in lieu of dower.

The deed and will were left with John. John had the deed recorded on that day. He kept the will and deed together in a safe place until a codicil appointing a new executor was executed in 1894, before the same witnesses. No member of the family ever heard of the deed until after the death of the mother, in 1898, when a contest arose over her will. The father had, however, told his wife and daughter that he had executed a will by compulsion of John.

The account of the three witnesses—John, Mr. Grimstead and Captain Hoffman—of what occurred at Mrs. Ryan's does not agree. Mr. Hoffman, examined by Mr. Grimstead, gave the following evidence:

"*Q.* What occurred first when we all came together?

"*A.* You asked Mr. White as to what he wished to have done with this property, which way he wanted to have it disposed of, and he dictated the entire deed of what he wanted done, giving his son John P. White so and

White *v.* White.

so, and his daughter Sarah so and so; also designating certain lands and property to his wife—in fact, he dictated the whole thing all the way through, as you asked him questions what he would want next, and so forth.

"*Q.* You say he produced a deed there from which this deed was drawn?

"*A.* Yes, sir."

And, on cross-examination, he states:

"*Q.* And Mr. Grimstead asked him what he wanted to do with his property?

"*A.* Yes, sir; he asked him what he wanted; he wanted to give so and so to his son John P. White, and so and so, his other piece of property on Commercial street, I think, to his daughter; and giving the whole thing what he wanted; the whole thing: and the deed was drew up accordingly.

"*Q.* That conversation took place, which you have stated, before any papers were drawn; is that so?

"*A.* Yes, sir; he stated first what he wanted to do, and then the papers were drawn; that is it exactly."

Mr. Grimstead and John swear that the old gentleman first stated that he wanted the homestead property to be assured to John, and that the deed was then drawn, and after that was done the disposition of his property was first spoken of. They clearly separate the two transactions, both as to the instructions given by the old gentleman and the preparation and execution of the papers, while Mr. Hoffman, whom I consider to be the more reliable witness, swears that the instructions were all given at once, but the deed was drawn first and executed, and then the will was drawn and executed afterwards. They all swear that he produced the deed of the homestead made by Fisher to him; that the deed from him to John was copied from it. They also swear that he himself mentioned the Stubelbein property on the corner of George and Bishop streets, and the Coffee property on Commercial avenue. Mr. Grimstead denied most emphatically that he went beforehand to the clerk's office to get any memoranda from these deeds, or obtained any information from any other source except from the single Fisher deed produced, and the information which the old gentleman gave him.

It is to be observed, upon a careful reading of the evidence, that no one of the witnesses, not even Mr. Grimstead himself, ventures to say that the old gentleman first suggested a deed,

White *v.* White.

but they seem to have taken it for granted that he wished to assure the homestead to John by means of a deed rather than a will, and making a deed was suggested by Grimstead. They all swear that Mr. Grimstead read the deed over to him and asked him if that was the way he wanted it, and that he said "Yes." The same with regard to the will. But all the evidence and the circumstances negative the idea that any explanation was made to him of the effect of the deed, or that he was in anywise made to realize and comprehend that the result of it would be that John could turn him out of doors the next day, and that even if he were willing to trust his son, still that son might die in his father's lifetime, leaving infant heirs who would be under no moral obligation to respect the verbal understanding between the father and son as to the possession of the homestead during the remainder of the father's life. And further, that if John should be unfortunate in business, and become indebted, his creditors might seize it to satisfy their debts. Nor was it suggested to him that his own and his wife's infirmities might make it necessary for them to sell or mortgage it for their necessary support in their old age.

But I am not at all satisfied from the evidence that the old gentleman was ever conscious that he had executed a deed, as contra-distinguished from a will, and I think that the weight of the evidence is that what he swears to is true, viz., that he supposed he had executed a will and was not conscious of having executed a deed.

I have already alluded to the circumstance that although the son disavows having been told by his father that he intended to make him a deed, and denies that he instructed Mr. Grimstead that a deed was to be drawn, yet Mr. Grimstead, nevertheless, swears that he was instructed by John that a deed was to be drawn, and brought a blank to the house for that purpose. I have already alluded to the discrepancy between the evidence of Captain Hoffman and that of Mr. Grimstead and John.

But there are two other matters which I think are of quite a convincing character. They all agree that Patrick White brought a single deed—the deed of the homestead property from Fisher— called the Fisher deed. The voluntary act of the old gentleman

in bringing that particular deed to the rendezvous is naturally relied upon as strong proof that he intended to convey the property it covered to his son. If he did not in fact bring that deed, the principal support of the defendants' case in that behalf is destroyed, and the defendants' witnesses shown to be unreliable. Now that deed is produced at the hearing, as well as the two deeds for the properties disposed of by the will. The daughter swears that those three deeds were kept together in an envelope in a locked drawer of a bureau in the house, of which her mother carried the key, and that she always knew them to be there whenever there was occasion to see them. That in 1895, when a conveyance of the property in question was made by Patrick to a third party, and by the third party to him and his wife, as tenants of the entirety, and again in 1898, when the conveyance already mentioned was made by Patrick and his wife to a third party, and by him to Patrick and wife and Sarah, as joint tenants, those deeds were taken from the bureau by her and handed to the solicitor who prepared the conveyances, and then put back again; that she never knew her father to go to the drawer and take them away; that he could not have done so without asking her mother for the key; and further, undoubtedly, in May, 1888, he was so blind, even if he had not been entirely illiterate and unable to read or write and so distinguish one deed from another, that he could not have picked out the Fisher deed from the two others, and carried that alone to the rendezvous; and that it would have been difficult for him to have done so without she or her mother knowing it, and the circumstance would at once have excited the attention and alarm of the family.

The next circumstance is this: the description in the old Fisher deed, which Patrick is stated to have produced, is as follows:

"All that certain lot of ground lying on the northerly side of Bishop street in the city aforesaid, and adjoining *lot this day conveyed by said Isaac Fisher to Archibald Foster*, beginning at the southwesterly corner of the said lot of said Foster, running thence on line of said street westerly fifty feet; thence northerly at a right angle one hundred feet; thence easterly at a right angle fifty feet: thence to place of beginning."

It will be observed that in the nature of things there could not have been any reference in that deed to the record of the conveyance of the adjoining property from Fisher to Archibald Foster.

This deed from Fisher to White was recorded on December 30th, 1848, in book 48, page 396.

Now in the deed here in question prepared by Mr. Grimstead, from Patrick to John, the property is described as follows:

"All that certain lot of land and premises situate, lying and being on the northerly side of Bishop street in the city of New Brunswick, County of Middlesex and State of New Jersey, *adjoining lot of land conveyed by deed of Isaac Fisher and wife to Archibald Foster, bearing date the twenty-sixth of December,* eighteen hundred and forty-eight, *recorded in Middlesex County Clerk's Office in Book 48 of Deeds,* at page 395. Beginning at the southwesterly corner of the said lot of said Foster and running thence on the line of said street westerly fifty feet; thence northerly at a right angle one hundred feet; thence easterly at a right angle fifty feet; thence to the place of beginning. Being the same premises conveyed to said Patrick White by deed of Isaac Fisher and wife bearing date the twenty-sixth day of December, eighteen hundred and forty-eight, and recorded in Middlesex County Clerk's Office in Book 48 of deeds, on page 396."

Now if neither Mr. Grimstead nor John P. White ever went or sent to the clerk's office to obtain a description of the homestead, or to get a reference to the other properties which the old gentleman or his wife owned, how came it that Mr. Grimstead was able to insert in the description of his deed, what is not found in the description of the deed from Fisher to Patrick, these words: *"Recorded in the Middlesex County Clerk's Office in Book 48 of Deeds, at page 395?"* There can be but one answer to this—either John or Mr. Grimstead or somebody in behalf of them, had been to the clerk's office and found the record of the deed from Fisher to Foster referred to in the deed from Fisher to White and recorded just one page before it in the record.

The attention of counsel for defendant was called to this circumstance after the oral argument and before his written argument was submitted, and he was asked to explain it. The only explanation he could give was that possibly he had left the

number of the book and the page blank at the time he prepared the deed, and filled them in after he arrived at the clerk's office. But a careful examination of the deed itself discloses to my eye no indication that the figures in question were written subsequent to the rest of the script. The ink is precisely the same, and appears to have been written at the same time, and is quite different in shade from that used by the clerk in making the usual endorsement on the deed.

These circumstances, namely, the improbability that the old gentleman could have been able either to get access to the Fisher deed without the assistance and knowledge of his wife, or, if he had obtained access, to select it from the other two, and take it to the house of Mrs. Ryan and afterwards replace it in its proper envelope, and the fact that either John White or Mr. Grimstead procured the description of the deed in question from the clerk's office, and then positively denied it on the stand, the result of which is that no reliance can be placed upon their evidence, taken in connection with other circumstances already alluded to, lead to the conclusion that the old Fisher deed was not before Mr. Grimstead when he drew the deed to John, and that the old gentleman's version is true—that he was not conscious of ever having executed a deed. No doubt some paper resembling a deed was produced, which at this late day Captain Hoffman thinks he recollects was a deed, and the old deed of the premises, and no doubt the deed then executed was read over to the old gentleman before he touched the pen which made his mark, and that he said it was all right. But it does not follow that he understood it was a deed as distinguished from a will. The burden of proving this is, under the circumstances, cast upon the grantee. The presumption is against him, and in my judgment he has not overcome it.

But if I am mistaken in this conclusion, the other grounds taken by counsel for the complainants, and mainly relied upon by him, must resolve the case in the complainants' favor. These grounds are two; either of which is in itself sufficient to invalidate the deed, and they support each other.

*First.* The conveyance was purely voluntary, and disposed of

White *v.* White.

substantially all the grantor's property, and in making it he did not have the benefit of the advice of independent, competent and disinterested counsel to make him fully understand, realize and appreciate the full effect and consequence of the deed, during his lifetime. It is not enough that it was read to him, and that he was told generally that it conveyed the property to John, and that he so understood it. Such an "understanding" is not sufficient in the case of an illiterate man unaccustomed to business transactions. The word "understand," so much used by lawyers and jurists in connection with the execution of deeds, wills and such instruments, includes the realization of the practical effects and consequences in every direction of the proposed act, be it deed or will.

In the second place, the understanding between the father and son was that the grantor was to retain the use and benefit of the property during his lifetime, and a clause of reservation to effect that understanding was not inserted in the deed. This, also, is a fatal defect.

The authorities in support of this position in this state are *Garnsey* v. *Mundy, 9 C. E. Gr. 243; Mulock* v. *Mulock, 4 Stew. Eq. 594; Martling* v. *Martling, 2 Dick. Ch. Rep. 122; Hall* v. *Otterson, 7 Dick. Ch. Rep. 522;* and *Lovett* v. *Taylor, 9 Dick. Ch. Rep. 311.* The older authorities are collected in *Garnsey* v. *Mundy* and *Mulock* v. *Mulock.* The latter case is peculiarly applicable here. The principles upon which the courts act in such cases are there luminously set forth, and I deem it not worth while to repeat them here.

I will advise a decree that the injunction be made perpetual, the deed from the father to the son be declared and decreed to be void, and the son and wife directed to re-convey to the father.