392      McKnatt, et al., vs. McKnatt, et al.

Syllabus.

---

James McKnatt, Wilbert McKnatt, Harry McKnatt, Ernest McKnatt, Susan Parvis, Elizabeth Shilkutt, Mary J. Reynolds, Mary S. Shockley and Oscar Cohee,

vs.

Charles W. McKnatt, Nettie McKnatt and James A. Smith, Executor of the last will and testament of Ebenezer McKnatt, deceased.

*Kent, March* 1, 1915.

A trustee is absolutely prohibited from purchasing property from his *cestui que trust*, independent of fraud, imposition, or improper advantage, and this applies to all fiduciary confidential relations.

Equity intervenes to protect the weak and the aged against imposition by designing people, and even against manifest improvidence, though there is no actual fraud in the other party, though where persons deal at arm's length, and on an equality, the interference is rare.

Where there is a fiduciary relation between the grantor and a grantee, arising out of a grantor's dependence on the grantee, the opportunity for imposition afforded by the relationship makes all transactions between them subject to suspicion and presumably void, and the burden of showing the fairness, adequacy and equity of the transaction is on the grantee seeking to retain the benefits of the bargain; and the same rule applies generally to all cases where there is any relation of trust or confidence.

Between a homeless, helpless, sick old man, eighty-one years of age, who required nursing and care and was in fear of going to the poor-house, and his tenant, not a kinsman, who had taken him to live with him, there was such a dependency and fiduciary relation that the former's convey-  . ance of his farm, valued at $5,000, for a recited consideration of one dollar in consideration of a home and care for life, made two and one-half months before his death, was presumably obtained by undue influence, and where such presumption was not rebutted by proof, the deed would be declared void.

Such transaction was improvident, unfair and inequitable, because the real consideration was not stated in the deed, and because there was no power reserved to revoke it in case of the grantee's non-performance, or any security for or effective means of enforcing its performance, so that the grantor in his lifetime could have avoided the deed; and the grantee's performance did not validate it, though entitling him to reimbursement.

In such case the deed might be canceled by the heirs at law and beneficiaries under the will of the grantor.

BILL TO SET ASIDE A CONVEYANCE.    The complainants, the heirs at law and beneficiaries under the will of Ebenezer McKnatt, seek to invalidate a deed made by him on May 1, 1913, to Charles W. McKnatt, for the consideration of one dollar, conveying a farm near Harrington, worth about five thousand dollars. The grantor, a bachelor about eighty-one years of age, being no longer able to farm his land, had boarded in Harrington at several places, including the home of his nephew, Joshua Reynolds. On December 30, 1912, while living there he made a will, which was after his death duly pro- . bated. By it he directed a sale of his property by his executor and a division of the proceeds. At that time his health had failed, and he had serious and incurable ailments, including Bright's disease of the kidneys, and required much nursing, being usually unable to walk without assistance. He was an

illiterate, uncommunicative person.    It is probable that at the time when he executed the will he was mentally competent to do so.    After the death of his nephew, Reynolds, he continued to live with the widow of his nephew; but it was not a happy state for either of them, so that when on April 17, 1913, the defendant, Charles W. McKnatt, the tenant on the farm, took the old man to live with him on the farm, there was no regret on the part of either Mrs. Reynolds, or Ebenezer McKnatt, but on the contrary words passed between them which indicated a feeling of relief on both sides, though Mrs. Reynolds was entitled under his will to nearly two-thirds of his property.    Between the feeble old landlord and his tenant there was no kinship, but the latter had been attentive in visits to his landlord and took good care of him after he came to the farm.    The new home was indeed a haven of rest for Ebenezer McKnatt, for there seemed to be no other home then open to him, and he was happy there, and for a while improved in health.    But he was very feeble and required increasing ministrations to such an extent that the defendant, Charles W. McKnatt, as he testified, was obliged to give up work on the farm in order to care for the homeless old man he had taken into his home, and who was not a very pleasant patient.

According to the uncorroborated statement of the grantee, the grantor expressed a desire to convey the farm to his tenant, the defendant, in consideration of the attention in the past and future care in this home during the rest of his life and the payment of his funeral expenses after his death.    Ebenezer McKnatt wanted to consult a certain Maryland lawyer, whom he named, but Charles W. McKnatt sent for his own attorney, R. R. Kenney, Esquire, of Dover, the other lawyer probably not being readily accessible.    By arrangement, three old friends of the grantor, Zadoc C. Fleming, William T. Sharp and Samuel L. Shaw, all men of standing and repute in the community, one of them a notary public, and James L. Wolcott, Esquire, (the attorney who came in the place of Mr. Kenney) met at the farm on May 1, 1913, and the proposed transaction was explained to them, both grantor and grantee being present. Thereupon the deed conveying the farm was then and there

prepared by the attorney, read over to the grantor and explained to him, and executed and acknowledged, and within a few days left for record at the proper office. In form, the deed was in the usual form of a conveyance, the only stated consideration being one dollar, and was without a warranty clause, and was signed by the grantor only.

The attorney who drew the deed and the friends of the grantor who were around him when he did so, all testified that he understood what he was doing, though he talked little; that he was capable mentally of making the deed; and that he and the grantee and those present understood the arrangement for the care of the old man, and that the grantor was satisfied with it. According to Mr. Fleming, the grantor said he wanted a home and did not want to go to the poor-house. Mr. Sharp testified that when Ebenezer McKnatt was asked by Mr. Wolcott the attorney, what he wanted done, the old man turned to Charles W. McKnatt, the grantee, who was present, and said to him: "What is it you want me to do? You tell them;" and also that after the deed and the consideration were explained to the grantor he had said that that was what he wanted. Mr. Shaw took the acknowledgement, and when he learned what the real consideration was, said he thought it was a "tame" deed, because the real agreement should have been in it, and discussed this with the grantee and the attorney. All of this was probably in the presence of the grantor, though whether he heard it, or not, does not appear from anything he said. At any rate, all of his friends there present approved of the transaction and trusted the grantee to fully perform his part.

The grantor owned practically no other property than the farm, and his personal property was just about enough to pay his debts, except the funeral expenses, after his death. He had no relatives nearer than nephews and nieces, and none dependent upon him, or intimate with him.

There was much testimony as to the mental condition and the character of his physical ailments, and the effect thereof on his mind. The physicians who testified differed on the point, as also did the witnesses.

On July 18, 1913, about two and one-half months after

the deed was made, the grantor died, the grantee having taken care of the grantor until the end of his days, and at his own expense buried his body after his death.

The bill was filed December 20, 1913, to set aside the deed, claiming that advantage had been taken of the helpless condition and dependence of the grantor on the grantee, and that at the time of the conveyance the grantor was of unsound mind and incapable of transacting business, was unduly influenced and was without the benefit of counsel. The prayers were for a cancellation of the deed, for an accounting of rents from January 1, 1913, and for a reconveyance by Charles W. McKnatt and his wife to the heirs at law of Ebenezer McKnatt, subject to the right of his executor to sell it for distribution as authorized by the will.

By their joint answer Charles W. McKnatt and wife denied the allegations of undue influence, mental incompetence and advantage taken of the condition of the grantor, while admitting the illiteracy, old age, physical weakness and serious illness of Ebenezer McKnatt. The defendants alleged that when the deed was made it was understood and agreed between the grantor and grantee that the consideration for it was the expense, service, care and attention incurred and rendered, to be incurred and rendered to the grantor for the rest of his life and the burial of his body after his death; that Charles W. McKnatt faithfully performed the consideration, including the payment of $202.25 for funeral expenses.

The executor of Ebenezer McKnatt was made a formal party defendant, and answered, submitting to the order of the court.

The case was heard on the bill, answer and testimony, heard, by agreement, by the Chancellor orally in open court.

*Henry Ridgely*, with him *T. Alan Goldsborough*, of Denton, Md., for the complainants.

*James H. Hughes*, for the defendants.

THE CHANCELLOR (after stating the facts as above). From the foregoing statement of facts, which I have prepared

in order to state as fairly as I could the important facts, the question for solution, stating it most favorably for the defendants, the grantee in the deed, is this: A very aged, sick and very infirm, homeless bachelor, dependent for many physical attentions on the nurse in whose home he lived, having made a deed by which he conveyed practically all his property to the nurse, not a kinsman, for a consideration not stated in the deed, viz., the caring for the grantor for the rest of his life, and the payment of his funeral expenses after his death, should the court set aside the conveyance after the death of the grantor, even though the grantor apparently comprehended the transaction and was not unduly influenced by the grantee to make it, and the grantee having in fact performed the consideration. The complainants claim that there was a fiduciary relation between the grantor and grantee, based on the dependence of the former on the latter, and the transaction between them was to be judged by the same standards as are dealings between trustee and *cestui que trust;* that the transaction was unfair to the grantor (1) because the real consideration was not stated in the deed; (2) because there was no power reserved to revoke it in case of non-performance, or effective means of enforcing performance of the consideration, for the helpless grantor was thereby left to the mercy of the grantee; and lastly, that the performance of the executory consideration did not change the legal situation.

There is no reported case in this State in which this question has been raised and decided. In the case of *Short v. Prettyman*, 1 *Houst.* 334, the executory consideration for a conveyance such as an agreement to clothe, board and lodge the grantor was stated in the deed, and there was no evidence showing a fiduciary relation. The court in *Jones v. Thompson*, 5 *Del. Ch.* 374, set aside a deed made by an aged and infirm man to two of his children of a large part of his property for a price shown to be grossly inadequate, on the ground that there had not been a sufficient explanation made to the grantor respecting the proposed transaction, and the evidence as to his comprehension of it was not satisfactory. In the unreported case of *Bellows v. Atkins*, in New Castle County, decided by me in

February, 1911, the grantor was physically self-reliant and mentally competent, and there was no reasonable ground for a claim of undue influence, or of existence of a fiduciary relation, or evidence of dissatisfaction by the grantor who lived six or eight years after conveying all his real estate to his son, so that after his death the court refused to set aside the conveyance at the instance of some of the other children of the grantor.

In none of these cases, nor in *Guest v. Beeson*, 2 *Houst.* 246, nor in *Rogers v. Rogers*, 6 *Pennewill* 267, 66 *Atl.* 374, or in any other cases in Delaware, was there a fiduciary relation, nor were the questions as to the existence and effect of such relation considered material by the courts, so far as appears in the opinions.

In this State a trustee is absolutely prohibited from purchasing property from his *cestui que trust*, and the prohibition does not depend on fraud, imposition, or improper advantage, and this applies to all fiduciary confidential relations. *Downs v. Rickards*, 4 *Del. Ch.* 416, 430; *Eberhardt, et al., v. Christiana Window Glass Co., et al.*, 9 *Del. Ch.* 284, 81 *Atl.* 774.

The transaction in question was not a gift, but a business bargain, by which the grantor conveyed his property in return for services to be rendered to him during the rest of his life, and this is the position taken by the grantee in his answer. It is to be judged, then, as a purchase, not a donation. Also it was not between kinsfolk, for there was no family relation between the grantor and grantee.

The case is best considered in two branches: (1) Could the grantor, Ebenezer McKnatt, have avoided the deed in his lifetime; and (2) can the beneficiaries under his will avoid the deed after his death?

As has been said in very broad terms, "Equity intervenes justly and properly to protect the weak and the aged against imposition by designing people, and even against manifest improvidence though there is no actual fraud in the other party." *Fidelity Title & Trust Co. v. Weitzel*, 152 *Pa. St.* 498, 502, 25 *Atl.* 569, 571; and the Chancellors of Delaware have used their power in such cases. Where persons deal at arms length,

and on an equality, the interference is rare; but when a relationship importing confidence arises, then, as Lord Eldon said, "those who meddle with such transactions take upon themselves the whole proof that the thing is righteous."

There has been some confusion in considering cases of constructive fraud, as shown by the author's note to 2 *Pomeroy's Equity Jurisprudence* (*3d Ed.*) *note* (1), *p.* 1722, where he refers to—

"* * * * two distinct classes of cases, which are governed by quite different rules, namely, those in which from the relations of the parties, invalidity is merely presumed, and the burden of proof is cast upon the one benefited to overcome such presumption by showing good faith; and those in which the voidable character is inferred as a conclusion of fact, without any presumption, from the partial incapacity of one party, or the overmastering influence exerted by the other. In the latter class, if the evidence of incapacity or unlawful influence is satisfactory, the voidable character of the transaction results as a necessary conclusion; there is no mere presumption to overcome. It is of great importance to keep these two classes distinct; otherwise the whole subject will become confused and inaccurate."

If there was here a fiduciary relation between the grantor and grantee, arising out of the dependence of the former on the latter, as a helpless patient upon the nurse in whose home he lived, then presumably the transaction in question was voidable and the burden of showing the fairness of the arrangement is on the defendant, the grantee who seeks to retain the benefits of his bargain. But even if the relationship did not exist, still if the mental and physical condition of the grantor was such that he did not comprehend the transaction, or if it be so unfair as to be an imposition on him, then the same result will be obtained, for then in place of an unrebutted presumption of invalidity there is a proof of facts establishing invalidity.

Was there between the grantor and grantee a fiduciary relation arising from the dependence of the former on the latter? *Pomeroy* in his *Equity Jurisprudence*, *vol.* 2 (*3d Ed.*) §956, refers to the broad scope of circumstances wherein it may arise, thus:

"Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and resulting superiority and influence on the other. The relation and duties involved in it may not be legal. It may be moral, social, domestic or merely personal."

It is the opportunity for imposition afforded by the relationship that makes all transactions between those within it subject to suspicion. Hence the clearly established rule is thus stated in a very recent case in Pennsylvania, decided in 1912, *Matthaei v. Pownall*, 235 *Pa. St.* 460, 466, 84 *Atl.* 444, where the fiduciary relation was shown to exist between a physician and patient:

"The burden of establishing perfect fairness, adequacy and equity is thrown upon the confidential adviser and 'if no such proof is established, courts of equity treat the case as one of constructive fraud.'"

There is no fixed test to establish a fiduciary relationship. It cannot be defined. It embraces the relation of physician and patient, nurse and patient, and generally all persons who are in any relation of trust and confidence. It was found to exist in the case of *Johnson v. Stonestreet*, (*Ky.*) 66 *S. W.* 621, where the landlord, eighty years old, lived with his tenant and received care and attention from him. In *Futrill v. Futrill*, 58 *N. C.* 61, it existed where one by his position had power and influence over another. In *McCord v. Bright*, 44 *Ind. App.* 275, 87 *N. E.* 654, it was defined to be "confidence reposed on the one side and accepted on the other". The court in *Payne v. Payne*, (1909) 12 *Cal. App.* 251, 107 *Pac.* 148, said it applied "to all the variety of relations in which dominion may be exercised by one person over another," and in that case it was established between an invalid woman and her daughter-in-law who nursed her. See, also, *Horner v. Bell*, 102 *Md.* 435, 62 *Atl.* 736.

In the case of *Walsh v. Harkey*, (*N. J. Ch.*) 69 *Atl.* 726, an aged woman after having had a paralytic stroke and having

McKNATT, et al., vs. McKNATT, et al.    401

Opinion.

become physically helpless and altogether dependent on her daughter and son-in-law, with whom she lived, for proper physical care and attention, in appreciation of past care and expectations of future service conveyed to them a house which was practically all her property, for a nominal consideration and "other good and valuable consideration," the deed being prepared by an attorney and executed comprehendingly. Even under such circumstances the deed was set aside at the instance of the heirs at law of the grantor after her death, because of the fiduciary relation and the absence of protection to the grantor. The court said:

"The grantor was at the time obviously so situated as to be dependent altogether on the daughter and son-in-law for proper physical care and attention, and the circumstances were such as that their influence was dominant."

It may safely be concluded that the fiduciary relation existed here between the grantor and grantee, because of the dependence of the former on the latter and the consequent dominion or superiority possible to the stronger over the weaker one, of the nurse over the patient, a homeless, helpless, very sick, infirm old man, who required of his nurse necessary physical attention. This dependence was not only a natural consequence of the relative condition of the two persons, but was shown to exist really, for at the important time when the patient was arranging to turn over all his property to the nurse, the former was compelled to appeal to his nurse to explain the arrangement between them. The dependence is further shown by the thought in Ebenezer McKnatt's mind that the poor-house was his only resort if he could no longer stay in the grantee's home.

Was it a fair transaction for Ebenezer McKnatt, a very old, very sick, and very dependent, homeless bachelor, when he conveyed away practically all his property, for a consideration not expressed in the deed, that the grantee would lodge, feed and clothe him for the rest of his life and bury his body when dead? If properly secured, the consideration might be thought to be adequate   A court should not weigh too carefully the

price paid by the aged side for home comforts and careful ministrations. But the transaction here considered would have been a poor bargain for any one to have made, however wise or alert to protect his own interests; for there was absolutely no security for performance of the consideration. The grantee might have sold and conveyed, demised or mortgaged to, or otherwise encumbered it in favor of, a person without knowledge of the transaction, and the grantor would have been helpless.

In this case it could be easily demonstrated, as the court did in *Sprague v. Duel*, 11 *Paige* (*N. Y.*) 480, that at his age and in his condition, Ebenezer McKnatt could have obtained an annuity of substantial amount by a sale of his farm. The omission of the real consideration from the deed made by Ebenezer McKnatt was a fatal defect in it, for it made the transaction unfair, unwise and improvident. In several cases the courts have so held in similar cases.

In the case of *Huguenin v. Baseley*, 14 *Ves. Jr.* 273, 301, a woman conveyed property to her spiritual adviser, a clergyman, and the validity of it was attacked on the ground of undue influence and lack of consideration. For the grantee it was claimed that there was an executory consideration, not stated in the deed, but the Chancellor disregarded it, and with respect thereto said:

"If that [the consideration] had been expressed, it would have amounted to so little as valuable consideration, that the Court would not have been justified in paying much attention to it: but I cannot find in any of these cases, in which a deed has been affected on account of undue influence, that the Court has ever attended to any thing, supposed merely to oblige the parties, if not expressed."

In *Stevens v. Shaw*, 66 *N. J. Eq.* 116, 57 *Atl.* 1024, the absence from the deed made by the complainant to the defendant of the real consideration, viz., that the grantee should manage the property and use it for support of the grantor for life and the remainder to belong to the grantee, was held of itself to render the deed voidable. And in *White v. White*, 60 *N. J. Eq.* 104, 115, 45 *Atl.* 767, the complainant had conveyed substan-

tially all his property to his son, it being understood between them that the grantor was to retain the use and benefit of the property during his life; but because of the omission of a clause of reservation to effect that understanding, the deed was held to be fatally defective. So also *Tygar v. Cook*, 77 *N. J. Eq.* 300, 78 *Atl.* 23, a case between a grantor and grantee, whereby the deed was set aside because of the omission from the deed of the consideration that the grantee should support the grantor, so that the deed did not express the full understanding of the parties. To the same effect is *Walsh v. Harkey*, (*N. J. Ch.*) 69 *Atl.* 726; and in *Matthaei v. Pownall*, 235 *Pa. St.* 460, 84 *Atl.* 444 (1912), it was considered an element of unfairness which warranted rescission. It is very clear, then, that Ebenezer McKnatt in his lifetime could have avoided the deed as between him and his grantee.

Have the beneficiaries under the will of Ebenezer McKnatt now a right to have the deed canceled?

The bargain turned out to be a good one for Ebenezer McKnatt, he having got what he bargained for. Why, then, it may be asked, should the court be concerned about those who, since his death are seeking to undo what he thought he had to do in order to provide himself the care and attention he needed, and which they did not give him in his necessity? The defendant urges that if the court had set aside this deed in the grantor's life it would have been a substitution of the court's judgment for his, and would have been a denial of his right to secure for himself the priceless benefit of a home and its comforts, care and attention and freedom from the uncertainties of life for a lonely old man. As was said by the court in *Fidelity Title & Trust Co. v. Weitzel*, 152 *Pa.* 498, 502, 25 *Atl.* 569, 571:

"Equity intervenes justly and properly to protect the weak and aged against imposition by designing people, and even against manifest improvidence though there is no actual fraud in the other party. But on the other hand it is not to be forgotten that the free control and disposition of property is often the sole means in the hands of age, to secure kindly care and attention, as well as support, from others, when greedy relations ignore the claims of relationship to the living but devote them-

selves with persistent assiduity to the estate after death. Where property is transferred in consideration of care and attention which is honestly bestowed till the end of life, courts do not need to be astute in weighing the profit or loss of the bargain.

\* \* \* \* \* \* \* \* \* \* \* \*

"It is not for others now to say that she might have done better than she chose to do for herself."

In this connection, there is a case in Delaware to be considered, viz., *Short v. Prettyman*, 1 *Houst.* 334, 347. This was an action of ejectment, and some of the parties claimed as grantees of Hannah Piper, who took title to an undivided interest in the land under a deed made to her by Isaac Short in fee for the consideration stated in the deed to be, that she comfortably clothe, lodge and board the grantor during his life. The validity of the deed was attacked because the grantor was mentally incompetent to make it, and the consideration was not good and valid to support the deed, being executory, and contained in a deed which she did not sign. Harrington, C. J., charged the jury as to the requirement of sufficient intelligence on the part of the grantor to a deed to comprehend the nature and effect of it. Also, that the consideration, though unusual, was not unreasonable under the circumstances, and said:

"As it is expressed, however, in this case, in the deed itself, and was a conditional consideration, we do not see why it should be avoided, if the consideration was performed; and if the jury are satisfied that it was, we think the validity and operation of it as a deed cannot be impeached on the ground merely that such was the nature of the consideration, though expressed in the deed itself. And if this be so, it was no objection to the validity of it that it was not signed by Mrs. Piper also. This would be a very unusual thing in a deed of bargain·and sale, nor would her signature to it be necessary to make the engagement an express covenant on her part, as she accepted the conveyance and the estate which it conferred on that condition and for that consideration merely."

It should be noted that the court wisely limited its ruling to the case before it. The consideration having been in fact performed, the deed was not invalid merely because the condition stated in the deed was a conditional, or executory one. In other words, the fact that the consideration stated in a deed

is executory will not of itself justify a nullification of the deed after performance of the consideration. But this is quite a different thing from saying that such an executory consideration may not in some cases be of itself evidence tending to show unfair dealing of the grantee towards the grantor, where an effort is being made to deprive the grantee of the property under a claim of real or constructive fraud practiced towards the grantor. The case is not an authority for the proposition that one who by unfair dealing with an aged, sick and infirm person obtains all his property by a deed for no other consideration than a verbal promise to lodge, board and clothe the grantor for life, may by performing his agreement retain the property as against those claiming it under the grantor. It certainly is not authority that it is good as a consideration if it be not stated in the deed, for the court found the grantee bound by it by accepting title under the deed, in which it was set forth. Besides, the title had passed to a purchaser from the original grantee.

The performance by Charles W. McKnatt, the grantee, of the considertaion did not validate the deed, but may entitle him to reimbursement from the estate of the grantor, which will be secured to him in the decree setting the deed aside. In the case of *Walsh v. Harkey*, (*N. J. Ch.*) 69 *Atl.* 726, this was expressly so held, and also by the Court of Appeals in Kentucky in *Johnson v. Stonestreet*, (*Ky.*) 66 *S. W.* 621. This is shown by numerous cases where the suits to undo unfair acts have been maintained successfully by heirs at law, devisees, or others who claim under the person with whom the unfair transaction was had.

Public policy is the reason of the rule which impels a court to protect persons such as Ebenezer McKnatt from themselves. *Futrill v. Futrill*, 58 *N. C.* 61. Because they are subject to be imposed on their contracts and conveyances are scrutinized with care, and if found to be unfair are set aside, so that the one who has imposed on him shall not longer retain the fruits of the unjust bargain, though both parties to it made it in good faith. This is considered the sure way to protect all in like condition. The validity of the transaction is judged

by the circumstances existing when it was consummated and not as it subsequently eventuated.·

Independent of the fiduciary relationship and its obligations, and even assuming that it did not exist, and that there was no undue influence, and though the grantee acted in entire good faith, with honest motives, and was prompted by kindness of heart, still for reasons above shown the transaction was so unwise as to show of itself that Ebenezer McKnatt was not then competent to make such a contract and did not comprehend the force and effect of it, though he may have known what the arrangement between him and his grantee was. In a somewhat similar case, *Hemphill v. Holford*, 88 *Mich.* 293, 50 *N. W.* 300, the court drew this inference: To understand "includes the realization of the practical effects and consequences in every direction of the proposed act, be it deed or will." *White v. White*, 60 *N. J. Eq.* 104, 45 *Atl.* 767. This is what Chancellor Saulsbury meant in *Jones v. Thompson*, 5 *Del. Ch.* 374. In any point of view, the deed cannot be sustained.

It was argued that Ebenezer McKnatt was mentally incompetent to make a deed, but it was not necessary to decide this difficult question. There is also in this case a question whether the absence of independent, legal counsel representing the grantor only, did not render the deed vulnerable, and some courts would so hold, for the attorney who was present was not the one desired by Ebenezer McKnatt, and was in fact the substitute for Mr. Kenney, the usual legal adviser of the grantee. Besides, Mr. Wolcott had not known, and was not interested in Ebenezer McKnatt, and was not keen to protect his interest. At least, he did not do so, as perhaps the Maryland lawyer, whose presence the grantor desired, would have done. But it is not necessary to rely on the asbence of proper legal advice in this case, for there are ample undisputed principles of law applicable here, which make it the duty of the court to cancel the deed in question. Many cases have been examined, and those cited by the defendant with especial care, but a review of them does not seem necessary, and would further lengthen this already too lengthy opinion.

The views here expressed may be thus summed up: A court of equity will diligently protect this aged and infirm person from imposition and imprudence in this important business transaction, as he was, by reason of mental debility, incapable of comprehending the transaction and its legal effect, and will set aside the contract and conveyance. There also existed here a fiduciary relationship between a grantor and grantee based on the dependence of the former, sick, helpless and old, on the latter for a home and nursing attentions, and presumably the conveyance was obtained by undue influence, and this presumption was not rebutted by proof. On the contrary, while the consideration for the conveyance, viz., board, lodging and nursing for life, might have been adequate, yet the omission of a statement of the consideration in the deed, and the absence of any security for the performance of it, made the transaction so inequitable that the grantor could have had it avoided on that ground. As it was inequitable for the grantee to retain the fruits of the transaction, the deed should be canceled on the application of the beneficiaries under the will of the grantor, even though the consideration was in fact performed by the grantee.

The conclusion is, then, that the complainants are entitled to have the deed made by Ebenezer McKnatt to Charles W. McKnatt canceled or declared void. Inasmuch as under the will of Ebenezer McKnatt there is no devise of the land, but a direction to his executor to sell it and distribute the proceeds as indicated in the will, the legal title should be reconveyed to the heirs at law of Ebenezer McKnatt, they being the persons who, if the deed had not been made, would have taken the legal title, subject to the power of the executor to sell it as directed by the will. The grantee will be required to make an account. of the rents and profits received by him since May 1, 1913. An opportunity will be given to the parties to be heard as to this and as to whether Charles W. McKnatt is entitled to be reimbursed for outlays for Ebenezer McKnatt and for services rendered to him. All the costs will be put on the defendant, Charles W. McKnatt.