## NEWELL v. HALLORAN.

No. 4418.   Decided November 3, 1926.   (250 P. 986.)

*Ray & Rawlins,* of Salt Lake City, for appellant.

*M. E. Wilson* and *Dan B. Shields,* both of Salt Lake City, for respondent.

CHERRY, J.

This is an equitable action to annul and cancel a certain lease of and option to buy certain described real property on Main street in Salt Lake City, executed by the plaintiff to defendant February 4, 1924, upon the ground of the constructive fraud of the defendant. From a judgment and decree in favor of defendant, the plaintiff has appealed.

The plaintiff's action is based upon the theory that at the time of the execution of the contract there existed between the parties thereto a confidential and fiduciary relation-

ship, from which a legal presumption arises that the defendant exerted undue influence upon the plaintiff in procuring the execution of the contract, and requires that the defendant, if he would sustain the contract, show by clear and convincing proof that he took no advantage of the plaintiff, and that the contract was, in all respects, fair and equitable. The pleadings and evidence presented two essential issues of fact: (1) Whether confidential and fiduciary relations existed between the parties at the time the lease and option were executed; and (2) whether the contract was obtained by the defendant without deception or concealment, and was fair and equitable to the plaintiff. The trial court made findings on both issues against the plaintiff and in favor of the defendant. The assignments of error challenge the findings, and thus present for review the general merits of the case.

There is no serious dispute in the evidence relating to the question of the relationship of the parties.

The plaintiff, Henry Newell, many years ago was engaged in the butcher business, first in New York and afterwards at Park City, Utah. About 25 years ago, having accumulated a substantial competency, he moved to Salt Lake City, where he has since resided. His business activities in Salt Lake City have consisted mainly of dealing in real estate and corporate securities. W. J. Halloran is the father of the defendant Ruel G. Halloran. At the time of the contract in question the defendant was president and his father was vice president of the Halloran-Judge Trust Company (hereinafter called the trust company), a corporation conducting among other things a real estate and insurance business at Salt Lake City. The trust company was incorporated about 17 years ago, prior to which time W. J. Halloran was engaged in the real estate business on his own account. After removing to Salt Lake City, and before October, 1919, the plaintiff and W. J. Halloran had numerous business transactions with each other. They

bought and sold real estate from each other. They owned real estate together at one time as tenants in common. Halloran as agent for the owner sold real estate to the plaintiff, and in turn sold it again as the plaintiff's agent. Plaintiff bought stocks and other property which were recommended by Halloran. Plaintiff bought stock in the trust company in a substantial amount, which he still owns. For several years he was a director in the corporation. During much of the time mentioned the trust company had charge of the securing of tenants and the collection of rents for the plaintiff's properties. The defendant Ruel G. Halloran, as an officer of the trust company, participated at times in the handling of the plaintiff's business. These transactions were uniformly satisfactory and beneficial to the plaintiff. During this period the plaintiff made investments and pursued business activities independent of the Hallorans or the trust company. At the time of the execution of the lease in question he was a stockholder in three active industrial corporations and a director in at least one of them.

In October, 1918, the plaintiff resigned as a director of the trust company, and in October, 1919, withdrew the business of collecting rents from it and turned it over to Willie Newell, a man of his on selection, who was not connected with either of the Hallorans or the trust company. Thereafter there were no specific transactions between the parties mentioned except the making of the lease and option in question. Two intervening circumstances proved by the plaintiff may be mentioned.

In the year 1922, the plaintiff changed his will by substituting the trust company, instead of another bank, as one of the joint executors thereof. The attorney who made this change, at the request of the plaintiff, was also attorney and one of the directors of the trust company.

In the years 1923 and 1924, the defendant, at the request of the plaintiff, made out the plaintiff's federal income tax returns.

The lease and option in question was executed on February 4, 1924. At the time the plaintiff was 82 years of age. His eyesight was impaired, his hearing was defective, and he was afflicted with rheumatism. But that he had no mental incapacity but was possessed of keen business sagacity and judgment is apparent from the evidence, and is not disputed. The defendant at the time was 38 years of age. That there was a degree of mutual regard and friendship existing between the parties arising from their previous acquaintance and relationship is not denied. The premises in question consisted of a structure in the business section subdivided into four parts, and were occupied by four separate tenants, under the plaintiff, who was himself collecting the rents. The plaintiff desired to be relieved of the burden of looking after leases and collecting the rents from so many persons, and long since had requested W. J. Halloran to find him a tenant who would lease the whole property. The testimony was that W. J. Halloran had not been able to find such a tenant because the rent demanded by plaintiff was too high. Some few months before the lease was finally made the plaintiff proposed to the defendant that he lease the whole property or find a tenant who would do so. The testimony in behalf of the defendant, which is wholly undisputed, is that the plaintiff at the time was receiving as rent from the several tenants of the property the total sum of $1,010 per month. His first proposal to defendant was for a monthly rental of $1,200, with an option to buy at the price of $150,-000. The defendant declined the offer, stating "You want too much money for it." The plaintiff renewed the negotiations from time to time during the next few months, gradually reducing the amount of rent demanded, until the parties agreed upon a 30-year lease with a rental of $1,050 per month for the first 10 years, $1,150 per month for the second 10 years, and $1,300 per month for the third 10 years, with the option to the lessee to buy the property at the end of any calendar year during the last 20 years of the period of the lease for $140,000. Although these negotiations were be-

tween the plaintiff and defendant alone, at the defendant's suggestion the lease was to be made to himself and the trust company jointly. Forms of leases were prepared accordingly, which the defendant delivered to and left with the plaintiff. The defendant was then called unexpectedly to California on account of the illness of his child. During this absence the matter was submitted to the board of directors of the trust company, who declined to enter into the agreement. The plaintiff was notified of the refusal of the trust company by W. J. Halloran, whereupon the plaintiff proposed that Ruel G. Halloran alone take the lease. A new lease was drawn and sent to the defendant in California, who signed and returned it. It was then delivered by W. J. Halloran to the plaintiff, who kept it at least one day, then took it in person to the office of the trust company where he signed and acknowledged its execution before a notary public and delivered it. There was testimony that when W. J. Halloran handed the lease in question to the plaintiff he stated to plaintiff that "it was a good thing and for him to sign it."

Thereafter the defendant assumed control of the premises under the lease, collected the rents from the tenants in possession, and paid the rent stipulated in the lease to the plaintiff monthly, which was accepted and retained by the plaintiff without question until January 29, 1925, when the plaintiff notified defendant that he disavowed the lease, etc. Shortly thereafter this action was commenced.

The claim that the evidence is sufficient to establish such a confidential and fiduciary relationship between the parties to the lease in question as to invoke the rule contended for by plaintiff must fail.

The theory advanced by the plaintiff that the relation of principal and agent existed between the parties cannot be entertained. Agency is normally a matter of contract. No such contract was proved. The trial court properly found against it.

The principal reliance of plaintiff is upon the general rule

of equity which extends beyond the formal legal relationships of parties, such as attorney and client, guardian and ward, parent and child, principal and agent, etc., and which has tersely been stated to be:

"Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed." *Tate v. Williamson*, L. R. 2 Ch. 55, 60, 61, per Lord Chelmsford.

The foregoing statement is quoted and approved in 2 Pomeroy, Eq. Jur. § 956, where the author adds:

"Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal; it may be moral, social, domestic or merely personal."

The controversy here is not over the correctness of the rule as stated, but arises from the opposing contentions as to whether the relations between the parties hereto were of such nature as to invoke the application of the rule to the transaction in question.

The precise question is, independent of any legal relationship, such as attorney and client, physician and patient, guardian and ward, parent and child, principal and agent, etc., and the presumptions arising therefrom, what are the essential elements of a relationship between persons necessary to be established in order to constitute a confidential and fiduciary relationship within the scope and meaning of the rules? The answer is indicated in

the quotations heretofore made, which state the rule in general terms. The relation is described by Lord Chelmsford as "such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other," and by Pomeroy as "a fiduciary relation * * * in which there is confidence reposed on one side, and the resulting superiority and influence on the other."

The doctrine rests upon the principle of inequality between the parties, and implies a position of superiority occupied by one of the parties over the other. Mere confidence in one person by another is not sufficient alone to constitute a fiduciary relationship. The confidence must be reposed by one under such circumstances as to create a corresponding duty, either legal or moral, upon the part of the other to observe the confidence, and it must result in a situation where as a matter of fact there is superior influence on one side and dependence on the other. In *Beach v. Wilton*, 244 Ill. 413, 91 N. E. 492, *McKnatt v. McKnatt*, 10 Del. Ch. 392, 93 A. 367, *Tompkins v. Hollister*, 60 Mich. 470, 27 N. W. 651, and *Nelson v. Brown*, 164 Ala. 397, 51 So. 360, 137 Am. St. Rep. 61, the principle is illustrated where the circumstances respectively were sufficient to establish the fiduciary relationship. And *Cowee v. Cornell*, 75 N. Y. 91, 31 Am. Rep. 428, *Doheny v. Lacy*, 168 N. Y. 213, 61 N. E. 255, *Kelly v. Ashforth*, 47 Misc. Rep. 498, 95 N. Y. S. 1004, and *Derdyn v. Low*, 94 Okl. 41, 220 P. 945, are cases resembling the case at bar in which there were not sufficient facts or circumstances showing superiority on the one side and weakness and dependence on the other, and in which it was held that the relationships were not confidential and fiduciary. The essential principle is applied in all the cases cited.

In *Cowee v. Cornell*, supra, Hand J., speaking for the court, said:

"The law presumes in the case of guardian and ward, trustee and cestui que trust, attorney and client, and perhaps physician and

patient, from the relation of the parties itself that their situation is unequal and of the character I have defined; and that relation appearing itself throws the burden upon the trustee, guardian or attorney of showing the fairness of his dealings. But while the doctrine is without doubt to be extended to many other relations of trust, confidence or inequality, the trust and confidence or the superiority on one side and weakness on the other must be proved in each of these cases; the law does not presume them from the fact for instance that one party is a grandfather and old and the other a grandson and young, or that one is an employer and the other an employee. The question as to parties so situated is a question of fact dependent upon the circumstances in each case. There is no presumption of inequality either way from these relations merely."

In the transactions between the plaintiff and the defendant or between the plaintiff and W. J. Halloran or the trust company, there is no fact or circumstance made to appear which tends to show a situation of trust or confidence wherein one had a commanding influence over the other; nothing indicating dominance, either personal, social, or moral. On the contrary, the evidence rather indicates that there was no inequality of influence in the circumstances of any transaction as a fact, but that each was free to act, and did act, upon his independent volition and will. Plaintiff did not intrust his money to be invested by the defendant, his father, or the trust company. For all that appears the terms of every purchase, sale and lease to which the plaintiff was a party were fixed or agreed to by plaintiff upon his independent judgment. That W. J. Halloran recommended certain transactions is no evidence of the plaintiff's weakness or dependence. Indeed, the independence of the plaintiff and his ability to take care of his own financial interests stand out rather conspicuously. The plaintiff profited by all of the previous transactions—at one time at the cost of the trust company. In no case was it shown that any profit was made at his expense. The plaintiff freely and voluntarily resigned as a director of the trust company, and later withdrew from it the collecting of his rents. For more than four years thereafter he attended to the leasing of his own property

and the collecting of the rents therefrom. The negotiations for the lease in question and the circumstances of its execution were all so natural and usual as to make it obvious that the transaction was one of free agents, dealing with each other on a level of equality. The case is not within the rule of fiduciary relationships, and the trial court in so deciding came to a correct conclusion.

The other question in the case—the fairness of the contract—requires but brief consideration.

The conclusion we have reached upon the question of fiduciary relations presents the consideration of the fairness of the contract in a quite different legal aspect. The presentation and argument of this subject by plaintiff's counsel has been premised upon the existence of fiduciary relations between the parties, and the burden thereby cast upon the defendant to show that the contract was obtained without deception or concealment and is in all respects fair and equitable. The premise having been removed, the defendant is under no legal obligation to explain the execution of the contract or show its fairness. However, under the plaintiff's theory, the trial court found that the transaction was fair, open, and honest, both in the manner of its execution and the terms of the contract itself. Much evidence, some conflicting, was taken on the subject of the fairness and equity of the contract. It is needless to review it, except to say that it was clearly shown that the rent agreed to be paid for the first 10-year period was $480 per year more than the property had been or was now yielding, and the price of the option was proved by a fair preponderance if evidence to be fully equal to the present value of the property.

Upon the whole we think the findings of the trial court are adequately supported by the evidence, and in view of his superior advantage in determining the weight and credibility of the evidence ought to be and are sustained.

The case in our opinion was correctly decided and the judgment is affirmed, with costs.

THURMAN, FRICK, and STRAUP, JJ., concur.

GIDEON, C. J.

I am unable to agree with the conclusions reached by Mr. Justice CHERRY. I shall not, however, attempt to state at any great length the reasons that impel me to withhold my assent from the majority opinion.

In my judgment the record conclusively shows that a confidential fiduciary relationship existed between the appellant, Newell and W. J. Halloran, father of the respondent, and also with the respondent. Twenty-five years ago appellant was engaged in the butcher business at Park City, Utah. Prior to going to Park City he had been in the same business in the city of New York. He had accumulated considerable property. From Park City he came to Salt Lake City. At or prior to the date of coming to Salt Lake City he became acquainted with W. J. Halloran, who was then engaged in the insurance and real estate business. Thereafter the business then conducted by W. J. Halloran was merged into and became the Halloran-Judge Trust Company. W. J. Halloran advised the plaintiff relative to investing the funds that he brought to Salt Lake City. It appears that every investment, with possibly one exception, made by appellant, either in real property or in corporate stock, in Salt Lake City was made upon the recommendation and advice of W. J. Halloran. They owned property together, and in buying and selling that property appellant had the advice and assistance of Halloran, Sr. The respondent and his father at all times controlled and directed the affairs of the Halloran-Judge Trust Company. Appellant bought stock in that company. He afterwards became one of its directors. The investments made on the recommendation of the father of the respondent were generally successful. The property in controversy was purchased on the advice of W. J. Halloran. Appellant resigned as a director of the trust company in 1918. Some suggestion is made that by that resignation there was

a break in the confidential or fiduciary relationship between appellant and the trust company and its officers. No such inference should be drawn from the fact of his resignation. In 1918 appellant's wife died. Thereafter he went to the state of California. If there was any reason for appellant's resignation as director, as the same is made to appear in the record, further than a desire to be relieved from the responsibilities of the office, it was that he was leaving the state. He was then 75 years of age. It further appears that in 1919 appellant returned to Salt Lake City and took over the rental of his properties. During his absence in California and prior thereto the trust company collected his rents. The cause for that also appears in the record. It was not by reason of any break in the confidential or friendly relationship which had theretofore and then existed between appellant and respondent. Mr. Newell had no children. He had reared a boy from his early youth known as Willie Newell. Willie Newell in turn had a son known as Harry Newell. This boy was 20 years of age. It was the desire of appellant that this young man should have employment, and he gave him the task of collecting rents on these premises. It was not by reason of any dissatisfaction with the trust company or its handling of his property. Nor was it by reason of any lack of confidence in the trust company or its officers or any break in the confidential and friendly relationship that then existed and had theretofore existed between the appellant and this trust company and its officers.

As further evidence of the relationship between appellant and the officers of the trust company, it was made to appear that subsequent to 1919, the lessee of the upper floor of the premises in controversy desired to obtain a renewal of his lease on that part of the premises. He had a lease prepared and submitted it to the appellant. Appellant did not sign the lease. The lessee met Mr. Halloran and stated to him the situation. Halloran in turn stated he would see what could be done. A few days thereafter the lease was delivered to the tenant by one of the employees of the trust company.

The lease had been executed by the appellant. The continued confidence that appellant had thertofore and then reposed in the trust company and its officers is evidenced by the fact that in 1922, the appellant had a codicil written to his will, and in that codicil substituted the trust company as one of the executors of his estate. It is, in my judgment in the face of these proven facts, idle to contend that any confidential or fiduciary relationship that had existed between appellant and the respondent and the respondent's father had ceased to exist at the date of the execution of the lease in question. By naming the trust company as one of the executors of his will the appellant reaffirmed the confidence which he had during all the years reposed in the trust company and its officers. This confidential and fiduciary relationship being established—and in my judgment it is abundantly established—it is unnecessary that any false representations were made to appellant by respondent or any intentional or wrongful advantage taken of appellant by respondent in procuring the lease in controversy. By reason of this confidential relationship the burden thereafter shifted to respondent to show that the lease was made after a full disclosure of all of its terms and that the lease in and of itself is not to the disadvantage of the appellant. *Beach v. Wilton,* 244 Ill. 413, 91 N. E. 492, and authorities there cited.

At the date of the execution of the lease the appellant was 82 years old. The lease continues for 30 years, with an option to the respondent to buy the property at a fixed price after 10 years. The respondent did not in that agreement contract or agree to buy the property. No security or guaranty except the written agreement of respondent was given to secure payment of the rents therein provided for. The appellant and his estate are under obligations to pay taxes, both general and special, on that property during the life of the lease, and the respondent is only required to pay the annual rental, with no obligation on his part to buy the property. That is, he has the right to purchase it and the appel-

lant and his estate are denied the right to convey clear title to the property until 30 years have elapsed if the respondent does not elect to buy the property before that date. The lease also provides that the appellant shall keep the property insured during the life of the lease in a sum not less than $30,000, and that the trust company shall select the insurance companies in which said policies shall be written. The lease, to say the least, is an unusual one, and its terms and provisions are such that, in my judgment, it cannot be construed to the best interests of appellant. In fact it is and must be to his disadvantage. The testimony of appellant is that the lease was brought to him by W. J. Halloran, and it was stated that it would be to his interest to sign it. Appellant was not advised to consult any one, either his counsel or others who might advise him respecting the nature of the contract and its duration, or the value of the property, present or prospective, either for sale or rental. A contract of the importance to the parties of the one involved ought to be scrutinized by the court, and if found to be to the disadvantage of the one who reposed confidence in the other should be set aside. The appellant at the date of the execution of the contract was an old man. He had lost his wife and had no direct descendants. It is undisputed that his eyesight was poor, his hearing was bad, and he was troubled with rheumatism. He remained almost constantly in his hotel. The hotel where he made his home was about a block from the office of the trust company. His testimony is that he left the hotel only to hobble up to the trust company offices. In other words, whatever contact he had with people outside of the hotel appears to have been with the officers of the trust company, or at least in the offices of the trust company. From the usual span of life alloted to man it is fair to conclude that the appellant will have passed to the great beyond many years prior to the termination of the lease in controversy.

In my opinion the judgment of the district court should be reversed, and the court directed to cancel the lease.