MATTIE E. BEACH, Plaintiff in Error, *vs.* I. H. WILTON
*et al.* Defendants in Error.

*Opinion filed February 16, 1910—Rehearing denied April 7, 1910.*

1. FIDUCIARY RELATIONS—*fiduciary relations are not confined to
legal relations.* Fiduciary relations are not confined to the legal
relations of attorney and client, guardian and ward, etc., but the
relation exists whenever it is proven that confidence was reposed
by one party and the trust accepted by the other.

2. SAME—*presumption is against validity of contract when a
fiduciary relation is proven.* In equity, when a fiduciary relation
is proven a presumption is raised against the validity of the trans-
action, and the burden is cast upon the dominant party to show
that the transaction is not against equity and good conscience.

3. SAME—*transactions between parties occupying fiduciary re-
lation are voidable upon grounds of public policy.* Transactions
between parties occupying a fiduciary relation are voidable upon
grounds of public policy and will be closely scrutinized by courts of
equity, and relief will be granted at the suit of the confiding party
unless the other party shows, by clear and convincing proof, that
he acted in good faith and did not betray the confidence.

4. SAME—*existence of confidential relation gives cause for sus-
picion.* The existence of a confidential relation between parties
to a contract gives cause for suspicion, and if a reasonable sus-
picion exists that the confidence reposed has been abused the con-
tract should be set aside.

5. SAME—*actual fraud is not necessary in order to invalidate a
deed if a fiduciary relation exists.* When a fiduciary relation is
shown to exist it is not necessary that intentional and actual fraud
be established in order to set aside a contract or deed.

FARMER, C. J., and VICKERS and COOKE, JJ., dissenting.

WRIT OF ERROR to the Circuit Court of Marion county;
the Hon. ALBERT M. ROSE, Judge, presiding.

KAGY & VANDERVORT, for plaintiff in error:

Whenever two persons stand in such relation that while
it continues confidence is necessarily reposed by one, and
the influence which naturally grows out of that confidence
is abused or the influence is exerted to obtain an advantage
at the expense of the confiding party, the person availing

himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no confidential relation had existed. *Roby* v. *Colehour,* 135 Ill. 337.

Transactions between a party and one occupying a fiduciary relation to her are, upon her motion, *prima facie* voidable, and, the relation being established, the burden is upon the other party to show an absence of undue influence by establishing that the transaction was had in good faith upon his part and was equitable and just between the parties, or that the complaining party acted upon the competent and independent advice of another, or such other facts as will satisfy the court that the dealing was at arm's length. *Thomas* v. *Whitney,* 186 Ill. 225; *Dowie* v. *Driscoll,* 203 id. 491; *Morgan* v. *Owens,* 228 id. 603.

It is not necessary that actual and intentional fraud be established, and it is immaterial by whom the undue influence was exercised if the relation is a fiduciary one. *McParland* v. *Larkin,* 155 Ill. 84; *Dowie* v. *Driscoll,* 203 id. 491; *Smith* v. *Henline,* 174 id. 184; *Rickman* v. *Meier,* 213 id. 507.

NOLEMAN & SMITH, and W. F. BUNDY, for defendants in error:

A deed will be permitted to stand, notwithstanding the fact that the intellectual powers have been somewhat impaired by age, if it appear that the grantor retains a full comprehension of the meaning, design and effect of his acts. Old age and loss of memory do not, necessarily and of themselves, indicate a want of capacity to make a conveyance. *Francis* v. *Wilkinson,* 147 Ill. 370; *Burt* v. *Quisenberry,* 132 id. 399; *Pooler* v. *Cristman,* 145 id. 405; *Perry* v. *Pearson,* 135 id. 218.

A fiduciary relation which brings the parties within the rule contended for by counsel for plaintiff in error is one growing out of the relation of administrator and heir,

guardian and ward, attorney and client and principal and agent. *Bishop* v. *Hilliard*, 227 Ill. 382.

Even though a fiduciary relation might exist, transactions between the parties are deemed to be valid if it is made to appear that they were entered into with a full knowledge of their nature and effect, were the result of the deliberate, voluntary and intelligent desire of the parties, and were not consummated by the exercise of the influence engendered as the result of the relation existing between the parties. *Kellogg* v. *Peddicord*, 181 Ill. 22.

The rule that where fiduciary relations exist between the parties the transaction is rendered voidable and the burden cast on the defendant to show that he acted in good faith does not apply in this case. That rule only applies to the cases of attorney and client, guardian and ward and parent and child, where the parent receives a gift or other benefit from the child. In all other cases of fiduciary relation the burden is on the party seeking to have the transaction set aside and does not shift. *Sears* v. *Vaughn*, 230 Ill. 572.

Mere persuasion or advice concerning the execution of a deed will not, however importunate, justify setting aside such deed on the ground of undue influence. *Wilcoxon* v. *Wilcoxon*, 165 Ill. 454.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a bill filed in the circuit court of Marion county by Mattie E. Beach, plaintiff in error, to set aside certain deeds to lots in the village of Patoka, in the said county, and a deed to a lot in Centralia, Illinois. After a hearing the trial court dismissed the bill for want of equity, and the case has been brought here by writ of error for review.

Plaintiff in error is about seventy-three years of age. She owned in Patoka lots 1 and 2 and the north forty-seven feet of lot 3, in block 12, of the original plat of that

place. On lot 1 was a two-story frame house. A part of this was used for the post-office and in one room plaintiff in error lived. Lot 2 was vacant and on lot 3 was a one-story frame house. Plaintiff in error and her husband went to live on these premises in 1881. She has resided on the property since that date. Her husband was a doctor and died about 1892. Defendant in error Wilton was in the undertaking business in Patoka and also dealt in real estate. He had known Mrs. Beach some seven years. Shortly before the time the trade hereinafter referred to was under discussion he had been living in a part of this property as her tenant. Early in 1908 Wilton and Mrs. Beach talked about selling or trading her Patoka property. There is a conflict in their testimony as to which first broached the subject. She testified that he was talking to her about the land sales he had made in Olney, and she asked him why he did not sell a lot she had in Centralia; that when he asked permission to sell the Patoka real estate she told him she did not want to sell herself out of a home; that he replied that the building was rotting down over her head and she might as well enjoy the proceeds of it; that he then stated enthusiastically the prospects of the Olney property in which he was interested. Wilton, on the contrary, testified that she had been asking him to sell her Patoka property and had suggested that he buy it himself and sell it again at a profit; that at about the time he sold his interest in the Olney syndicate to Charles E. Blankenship (another defendant in error) he mentioned that fact to her and she said she was disappointed; that she expected to trade her Patoka property for that; that he then told her he would get another similar interest and trade it to her.

Before stating further details concerning the trading of plaintiff in error's Patoka property it will aid in an understanding of the subject to describe, generally, the interest in the real estate in Olney (the county seat of Richland

county, the second county east of Marion,) for which Mrs. Beach traded.

In 1907 Wilton and one George B. Simcox acted as selling agents for certain real estate in Olney. They associated with them one of the defendants in error, Charles E. Blankenship, and four other persons, namely, John H. Simcox, Charles A. Porter, John C. Martin and J. B. Porter. The five last named persons furnished the money to purchase fifty-five acres of land in Olney. A part of it was platted into lots and certain grading and improving was done thereon. A public auction was held and lots were sold on the installment plan for a small payment down and $1.50 a week thereafter. The title to the land was placed in one of the members of the syndicate, as trustee. It was agreed that the five persons who had furnished the money should first receive that back and thereafter the proceeds received should be divided as follows: Wilton and George B. Simcox to receive one-half the profits, divided equally between them, and the other one-half of the profits to be divided equally among the other five. It is not entirely plain from this record how many of the Olney syndicate lots had been sold, paid for or lapsed in May, 1908, when the trade with Mrs. Beach was made. As we figure, to May 1, 1908, there had been received from the sale of lots, after paying the expenses for collecting, approximately $5916. Wilton and George B. Simcox had been advanced out of this sum, as a part of the profits expected to be realized thereafter, $900 apiece. This would leave to be divided $4116 among the five who had furnished the money. The land originally cost $6000 and the grading, etc., about $650. The total cost advanced by the five financial members of the syndicate was therefore about $6650. We assume from what is said in the briefs that the $4116 had already been divided among these five on May 1, 1908. This would leave still due to these five, to pay back the original investment, $2534. Thirteen months

later (that is, May 31, 1909,) enough had been collected from the sale of lands to pay back this amount ($2534) and about $300 on profits. Thirty-nine acres of the fifty-five had been subdivided into one hundred and eighteen lots. It is claimed by defendants in error that the one hundred and three lots sold were worth about $222 each, or a total of $22,990; that the sixteen acres unplatted and the unsold lots were worth $5650, and that therefore the original value of the syndicate property was $28,640. Shortly before the trade with Mrs. Beach, Wilton sold his interest in the Olney syndicate to Charles E. Blankenship for $1750 cash, with the further provision that he (Wilton) was to receive $750 more if the proceeds of the syndicate lands reached a certain amount. What that amount was is not shown. George B. Simcox still owned in the syndicate an interest of the same value and nature as Wilton's.

In discussing the sale or trade of Mrs. Beach's Patoka property the question of trading for an interest in the Olney syndicate was considered. Mrs. Beach testified that she told Wilton she did not wish to do anything in the matter until she had talked with her nephew, Edward Johnson. He lived on a farm within a few miles of Patoka. A part of her testimony on this subject is as follows: "I says, 'I cannot make any trade until I see Ed.' * * * He (Wilton) talked on with me and he told me about Mr. Blankenship owning a share. He says, 'You know it is a good thing or Mr. Blankenship wouldn't want any of it.' I said I wanted to talk to Mr. Blankenship before I did anything at all. I told him I would know by what Mr. Blankenship said about it. If he recommended it as a good thing I would do it. * * * Mr. Blankenship came. He said it would be a good thing for me to make a trade." She further testified that she told both Blankenship and Wilton at that time that she did not understand the matter, although they both tried to explain to

her the details of the Olney real estate syndicate. Blankenship had known Mrs. Beach for many years and she valued his opinion on business matters highly, and testified that she had consulted with him before on such matters. Blankenship admitted that he advised her on this deal but stated that he did not remember whether he had advised her as to other transactions. He told her at this time that the Olney syndicate was a good thing and that the interest that Wilton wished to trade her was worth $4000, and that she would begin receiving returns from it about January 1, 1909. After he left, her nephew, Johnson, came to town in response to her telephone message. He had a talk with her and with Wilton about the proposed trade, the latter explaining to him at some length as to the details. It does not appear from the testimony of Johnson or Mrs. Beach that he was asked for or gave his advice.

The defendant in error Charles E. Blankenship, Dean Blankenship and C. S. Altom were the proprietors of a private bank in Patoka. The evidence shows that at or shortly before this discussion about the trade Charles E. Blankenship and Altom had been told by Wilton that he could buy Mrs. Beach's Patoka property for $2500, and that they told him they would take it for that price if the title was shown to be good. Blankenship went to see Mrs. Beach with reference to this trade on May 8, 1908. After securing an agreement from Blankenship and Altom that he could draw on them, to purchase Simcox's interest, from $2000 to $2500, Wilton went to Salem, in the same county, and saw Simcox. As a result of his talk he purchased Simcox's interest for $2000 and gave a check on Blankenship's bank for the amount, the understanding being that the check would not be cashed until the abstract could be brought down and examined as to the Patoka property. Simcox at the same time signed and acknowledged an instrument assigning his interest to Mrs. Beach. The first or second day following, Charles E. Blankenship

had a talk with Simcox with reference to this sale. The latter called his attention to the fact that he and Wilton had each been advanced $900 on prospective profits, so that Mrs. Beach could not draw anything on her interest until the five men who had furnished the original purchase money had been paid back $1800 in profits in addition to the amount of their investment. When Blankenship returned to Patoka that day he called on Mrs. Beach and stated that he had misinformed her as to the time when she would begin to receive returns from the Olney syndicate; that she could not begin to collect returns from the Simcox interest sooner than 1910; that she could back out of the trade if she desired. It appears that Wilton, Mrs. Beach and Blankenship talked over the matter again, and Mrs. Beach said it would be impossible for her to make the trade on the terms formerly proposed, as she would need something to live on until she began to receive returns. After some talk as to the amount required for her expenses it was agreed that Wilton should pay her $100 extra. Wilton testified that in the meantime he had brought the assignment of Simcox's interest in the Olney property to Mrs. Beach and that she told him to put it in the bank. Mrs. Beach claims that she never saw the assignment. The evidence shows that the assignment and said $100 were deposited in the bank by Wilton. When the abstract was presented to the bank officials they found fault with the title to lot 2 and the north forty-seven feet of lot 3 on account of a sheriff's deed having been given a number of years before to some person who never quitclaimed and could not then be located. They refused to take the property and asked Wilton to make good his $2000 check which he had drawn on them to pay Simcox. Wilton at that time had $1300 of his own in the bank, and after some negotiations borrowed from Henry Clark, another defendant in error, $700 and paid the bank the $2000. Wilton testified that in order to secure Clark he

conveyed to him lot 2 and the north forty-seven feet of lot 3, with the understanding that he (Wilton) could have the property back when he paid Clark the $700. Before going to Salem to see Simcox, Wilton had persuaded Mrs. Beach to sign and acknowledge a deed to all of her Patoka property, leaving the name of the grantee blank. At the time he borrowed the money from Clark he inserted the latter's name in this deed as grantee. A question arose as to whether the deed was good, and Wilton went to Mrs. Beach and persuaded her to execute another deed for the Patoka property with himself as grantee, the original deed being then destroyed. After negotiations with Charles E. Blankenship and Altom, Wilton sold lot 1 to the bank for $1400, the deed being made to Dean Blankenship, who was cashier of the bank. After the trade had been consummated Wilton told Mrs. Beach that he ought to have a commission for acting as her agent, and persuaded her to deed him her Centralia lot. The consideration for this lot was named in the deed as $175. The testimony tends to show that it was worth from $135 to $200. Not long after Mrs. Beach signed the deed to her property she became dissatisfied with the trade. One of her nieces went to Blankenship and asked him to have the trade rescinded and the property deeded back to Mrs. Beach. Nothing came of the negotiations, and September 8, 1908, this bill was filed.

Counsel for plaintiff in error insist that the testimony in the record shows that a fiduciary relation existed, at the time of this transaction, between her and Charles E. Blankenship; that it was largely, if not solely, on his advice and because of the confidence she had in him that she traded her property. They further insist that the evidence in this record shows clearly that the interest she received in the Olney syndicate was practically without value to her. Defendants in error, on the contrary, contend that the record does not show that a fiduciary relation existed

between Mrs. Beach and Blankenship, and that the weight of the evidence tends to show that the value of Simcox's interest in the Olney syndicate was worth what it was represented to Mrs. Beach.

Counsel for defendants in error argue that a fiduciary relation, under the law, does not exist unless it grows out of the relation of administrator and heir, guardian and ward, attorney and client or principal and agent. Such is not the law. In Pomeroy's Equity Jurisprudence (vol. 2, 3d ed. sec. 956,) that author, in discussing this question, says: "Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal. It may be moral, social, domestic or merely personal." The rule as thus stated has been repeatedly quoted with approval by this court. (*Roby* v. *Colehour,* 135 Ill. 300; *Thomas* v. *Whitney,* 186 id. 225; *Walker* v. *Shepard,* 210 id. 100; *Irwin* v. *Sample,* 213 id. 160.) The fiduciary relation exists between parties where there is a relation of trust and confidence between them,—that is, where confidence is reposed by one party and the trust accepted by the other. In *Mayrand* v. *Mayrand,* 194 Ill. 45, this court said (p. 48): "The term fiduciary or confidential relation, as used in this connection, is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused,—in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man

trusts in and relies upon another. The only question is, does such a relation in fact exist?"

There is a clear distinction between that class of contracts that are voidable because they have been executed through actual undue influence, consciously and designedly exerted, and those contracts that are sought to be set aside because of the fiduciary relation existing between the parties. In the former case, the undue influence being established as a fact, a contract obtained by its means is voidable and may be set aside without the necessary aid of any presumption, while where the fiduciary relation exists equity does not deny the possibility of valid transactions between the parties, but, when such fiduciary relation is proven, raises a presumption against the validity of the contract and casts upon the party desiring to uphold it the burden of proving affirmatively that such contract is not against equity and good conscience, thereby overcoming the presumption. (2 Pomeroy's Eq. Jur.—3d ed.—secs. 955, 956.) The same author, in discussing transactions which are questioned because of the fiduciary relation between the parties, says (sec. 955) : "No mental weakness, old age, ignorance, pecuniary distress, and the like, is assumed as an element of the transaction. If any such fact be present it is incidental, not necessary,—immaterial, not essential. Nor does undue influence form a necessary part of the circumstances, except so far as undue influence, or, rather, the ability to exercise undue influence, is implied in the very conception of a fiduciary relation, in the position of superiority occupied by one of the parties over the other, contained in the very definition of that relation. This is a most important statement,—not a mere verbal criticism. Nothing can tend more to produce confusion and inaccuracy in the discussion of the subject than the treatment of actual undue influence and fiduciary relations as though they constituted one and the same doctrine." *Mayrand* v. *Mayrand, supra; Thomas* v. *Whitney, supra.*

Transactions of parties between whom the fiduciary relation exists are *prima facie* voidable upon grounds of public policy. They will be closely scrutinized by a court of equity, and relief will be granted unless the party claiming the benefit of the contract shows, by clear and convincing proof, that he acted with perfect good faith and did not betray the confidence reposed in him. (1 Beach on Modern Law of Contracts, sec. 825; *Thomas* v. *Whitney, supra; Casey* v. *Casey,* 14 Ill. 112.) A confidential relation gives cause for suspicion. If a reasonable suspicion exists that confidence has been abused where reposed, the contract should be set aside. (*Uhlich* v. *Muhlke,* 61 Ill. 499; *Dowie* v. *Driscoll,* 203 id. 480.) Obviously, from the record in this case, Mrs. Beach trusted and relied upon the advice of Blankenship. It is apparent from the testimony of Blankenship and Wilton, as well as that of Mrs. Beach, that Blankenship understood she wanted to talk with him because she had confidence in and trusted him. He was engaged in the lumber business in Patoka, an official of the bank of that village and one of its leading business men. Mrs. Beach was a woman of very little business experience, and while the evidence does not show that she was incapable of doing ordinary business, it does tend to show that she was not strong physically. A certain decay of mental powers is a natural consequence of old age. (*Drum* v. *Capps,* 240 Ill. 524.) It would not be strange that at her age, in her physical condition and with her lack of business experience, she should have confidence in and follow implicitly the advice of Blankenship. Under somewhat similar circumstances fiduciary relations were held to exist and contracts set aside by the Supreme Court of Michigan in *Tompkins* v. *Hollister,* 60 Mich. 470, and *Barnes* v. *Brown,* 32 id. 146. Counsel for the defendants in error argue that she did not rely entirely upon the advice of Blankenship; that she wanted to consult her nephew, Johnson. Everything tends to show that she made

this contract relying upon Blankenship's judgment and advice. Whether she did or did not advise with Johnson does not alter the fiduciary relationship between her and Blankenship. In *Walker* v. *Shepard, supra,* the appellee, Anna E. Shepard, had been brought up by the father of Amos W. Walker, appellant. · If the rule of law contended for by counsel for the defendants in error were the law of this State, fiduciary relations would not have existed between those two parties on the facts in that case, yet this court held that such a relation did exist, and that the deed Walker obtained from Mrs. Shepard should be set aside although she had consulted with her husband before she signed it. It appeared there that the husband was an ignorant man. It is quite clear from this record that Johnson was not a man of affairs and knew very little about transactions of the kind Blankenship and Wilton were advising Mrs. Beach to make.

Counsel for defendants in error contend that under the reasoning of this court in *Sears* v. *Vaughan,* 230 Ill. 572, *Bishop* v. *Hilliard,* 227 id. 382, and *Kellogg* v. *Peddicord,* 181 id. 22, the conclusion must be reached that a fiduciary relation did not exist between Blankenship and Mrs. Beach. We think counsel misapprehend those decisions. Nothing is said in any of them that in any way conflicts with the rules of law heretofore stated in this opinion. Under the authorities, as the fiduciary relation existed, the burden rested upon Blankenship to show that the transaction was entered into by Mrs. Beach with full knowledge of its nature and effect and was the result of her deliberate, intelligent desire and for her benefit. We do not think such a showing is found in this record.

Counsel for defendants in error claim that the evidence shows that Simcox's interest was worth the amount Blankenship stated to Mrs. Beach,—that is, $4000. Mrs. Beach testified that Wilton stated to her that he could not tell definitely what Simcox's interest was worth, but that it

was worth at least $4000 and perhaps $10,000. Several witnesses who were dealing in real estate in Olney testified for defendants in error that the interest in question was worth about $4000, while other real estate dealers from Olney testified for Mrs. Beach that the value was purely speculative. The proof as to the receipts and collections from the sales from this real estate between May 1, 1908, and May 31, 1909, does not tend to uphold defendants in error's contentions. The collections on the lots sold on the installment plan seem to have steadily, although not with regularity, lessened during that time. During May, 1908, the collections were $308, while during May, 1909, they were $86.24. Blankenship admits that he told Mrs. Beach that Simcox's interest was worth $4000 at the time she made the contract. He then knew that he had purchased, the week before, Wilton's interest for $1750 cash, and the possibility, on certain conditions, of paying $750 more. He knew that Mrs. Beach considered her property worth more than $2500, though she had finally consented to sell it for that amount. When Blankenship recalled that Simcox had already drawn $900 on hoped-for profits and went to inform Mrs. Beach of the mistake he had made in that regard, he did not tell her that the interest in question would be worth $900 less. Indeed, it seems that he still intended to have her understand that Simcox's interest was worth $4000.

Manifestly, from this record, Mrs. Beach did not understand the nature of the transaction she was entering into. Blankenship testifies that when he told her she could not begin to draw profits from the Olney real estate until 1910 she said she could live on $75 a year; that when he expressed a doubt she said, "It don't cost me much to live, for I have got a good garden and it don't cost me much for clothing." Now, the only garden she had was that on her Patoka property. She does not seem to have realized that as soon as the trade was made she would have to give

up that property. Neither Blankenship nor Wilton told
her, at the time she made the above statement, that she
was making a mistake on that point. The conclusion, in
our judgment, on this record is inevitable that the interest
in the Olney syndicate was purely of a speculative value
and that no one could tell with a reasonable degree of cer-
tainty what it was worth. In view of the trust and con-
fidence which Blankenship knew was being reposed in him
by Mrs. Beach it was his duty to inform her, candidly and
fairly, as to all the facts. Instead of doing this he failed
to tell her what he had paid for a like interest and also
failed to tell her that Simcox's interest had been purchased
for $2000. When a fiduciary relation exists, it is not nec-
essary that intentional and actual fraud be established in
order to set aside a contract or deed. *Dowie* v. *Driscoll,
supra; McParland* v. *Larkin,* 155 Ill. 84.

The following authorities, in addition to those already
cited, tend to support the conclusions heretofore reached:
*Mitchell* v. *McDougall,* 62 Ill. 498; *Sands* v. *Sands,* 112
id. 225; *Herr* v. *Payson,* 157 id. 244; *Woods* v. *Roberts,*
185 id. 489; *Rickman* v. *Meier,* 213 id. 507; *Weston* v.
*Teufel,* 213 id. 291; *Leonard* v. *Burtle,* 226 id. 422; *Mor-
gan* v. *Owens,* 228 id. 598; 20 Cyc. 34; 14 Am. & Eng.
Ency. of Law, (2d ed.) 194.

Henry Clark, another of the defendants in error, is not
an innocent third party. He knew all the facts at the time
he advanced the $700 to Wilton and took a deed to lot 2
and a part of lot 3. If the deeds to Blankenship and Wil-
ton must be set aside, it needs no citation of authorities to
show that the deed to Clark must also be set aside.

The evidence clearly shows that a fiduciary relation
existed between Charles E. Blankenship and plaintiff in
error, and that Blankenship did not tell Mrs. Beach all the
facts but did state that it would be a good thing for her
to make the trade; that the consideration for the Patoka
property was inadequate and the trade not a beneficial one

to Mrs. Beach; that she received no consideration for the Centralia lot, and that Wilton was an active participant in all the transactions and knew all about them; that instead of the proof being clear and convincing that Blankenship and Wilton acted in perfect good faith and that Blanken-ship did not abuse or betray the confidence reposed in him, the evidence shows to the contrary. The circuit court erred in dismissing the bill.

The decree of the circuit court will be reversed and the cause remanded to that court, with directions to set aside the deed from Mrs. Beach to Wilton of the Patoka prop-erty and her deed to him of the Centralia lot; also to set aside Wilton's deed to Dean Blankenship for lot 1 and Wil-ton's deed to Clark for lot 2 and the north forty-seven feet of lot 3. The decree will also provide that the interest in the Olney syndicate assigned by George B. Simcox to Mrs. Beach shall be sold under the direction of the court to the highest and best bidder for cash, and that the pro-ceeds thereof (together with the $100 deposited in the bank by Wilton for Mrs. Beach) shall be divided as follows: To Dean Blankenship the amount paid to Wilton for lot 1, to-wit, $1400; to Henry Clark the amount advanced Wil-ton and secured by lot 2 and the north forty-seven feet of lot 3, to-wit, $700; and the balance, if any, to Wilton. If there is not sufficient to pay the full amount above set forth, the proceeds from the sale of the interest in said Olney syndicate and said $100 shall be divided between Dean Blankenship and Clark, two-thirds to the former and one-third to the latter.

*Reversed and remanded, with directions.*

FARMER, C. J., and VICKERS and COOKE, JJ., dissenting.