### FIRST CALUMET TRUST & SAVINGS BANK et al. v. ROGERS et al.

(Circuit Court of Appeals, Seventh Circuit. March 30, 1923.)

No. 3119.

1. **Attorney and client ⬡⟹32—Better practice that attorneys testifying as to material facts withdraw as counsel.**

   Where attorneys wish to testify in a case in which they are employed as to other than merely formal matters, it is much better practice that they withdraw as attorneys from the case.

2. **Corporations ⬡⟹310(1)—Contract to devote "entire time" to business precludes acceptance of other employment.**

   The contract of a high-salaried executive officer of a corporation to devote his entire time to the business of his employment means that he shall devote his entire capacity in mental attainments and experience to such employment, and does not permit him, without the knowledge, consent, or approval of his employers, to accept employment and salary from another.

3. **Account ⬡⟹14—Equity has jurisdiction of suit to compel accounting by employee breaching contract creating fiduciary relation.**

   Where a contract for the employment of a high-salaried executive required the latter to devote all his time to the management of an estate and of transportation companies owned largely by such estate, the relation between him and his employers was a fiduciary one, requiring the highest fidelity on his part, and where he breached the express terms of his contract by accepting other compensation from other employers a court of equity had jurisdiction to require an accounting for moneys paid to him in excess of the amount that would have been paid under the terms of his contract, had he disclosed his outside employment and his employers are not restricted to an action in damages for breach of such contract.

Appeal from the District Court of the United States for the District of Indiana.

Suit in equity by Henry H. Rogers and another, surviving executors of the last will and testament of Henry H. Rogers, deceased, and others, against the First Calumet Trust & Savings Bank, a corporation, as executor of the last will and testament of Charles W. Hotchkiss, deceased, and others. Decree for plaintiffs, and defendants appeal. Affirmed.

⬡⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Louis L. Dent, of Chicago, Ill., and Frederic W. Jenkins, of Binghamton, N. Y., for appellants.

W. H. Thompson, of Indianapolis, Ind., and Howard M. Carter, of Chicago, Ill., for appellees.

Before BAKER, EVANS, and PAGE, Circuit Judges.

PAGE, Circuit Judge. This appeal is to reverse a decree in favor of the Virginian Railway Company, Atlantic Coast Electric Railway Company, Atlantic Coast Electric Light Company, and Richmond Light & Railway Company, here called plaintiffs, against the First Calumet Trust & Savings Bank, as executor of the will of Charles W. Hotchkiss, and Walter J. Riley and Mary J. Hotchkiss, here called defendants. Charles W. Hotchkiss became president and a director of the Chicago Utilities Company and three subsidiaries owned by it, here called Utility Companies, under a contract for a salary of $50,000 per year and a commission of 7½ per cent. in case of a sale of their properties. To enable Hotchkiss to accept outside employment, his salary was reduced to $25,000, effective June 1, 1913.

Prior to 1913, Henry H. Rogers died, leaving, as his executors, Henry H. Rogers, Jr., his son, the Farmers' Loan & Trust Company of New York, and John W. Sterling, his attorney. Mr. Sterling died in 1918, and the surviving executors were joined with the plaintiffs in this suit, but were not awarded any relief. The Rogers estate controlled the plaintiff corporations, and, seeking for them an executive head, had negotiations with Hotchkiss, resulting in a letter from Sterling to Hotchkiss and a reply from Hotchkiss as follows:

"New York, May 22, 1913.

"Dear Mr. Hotchkiss: Yours of the 22d instant is at hand. Now that you have arranged with the Chicago Utilities Company for a modification of your existing contract for services, whereby not more than one-half of your time is to be devoted to its interests for the period from June 1, 1913, to July 1, 1914, for which services you are to receive from it at the rate of $25,000, instead of $50,000, per annum (unless further modified as hereinafter mentioned), and now that you have also agreed that all the remainder of your time shall be devoted to the interests of the H. H. Rogers estate, for which you are to receive from it, during such time as you may receive a salary of $25,000 from the Chicago Utilities Company, a salary of $25,000, I send you further detailed memorandum of our understanding as follows:

"If anything should happen whereby the Chicago Utilities Company should not need your services between June 1, 1913, and July 1, 1914, and your salary, payable by that company, should be reduced, or cease altogether, then your salary, payable by the Rogers estate, would be proportionally increased from the rate of $25,000 per annum to the rate of $50,000, or raised to the latter rate, per annum, which latter rate it is agreed you will receive from the Rogers estate for the year beginning July 1, 1914, provided, of course, that on that date your salary shall have ceased altogether, so far as the Chicago Utilities Company is concerned, and provided, also, you are able to devote your entire time to the interests of the Rogers estate.

"You are to be made temporarily the vice president, or permanently the president, or chairman of the board, of the three electric railway companies in Staten Island, New Jersey, controlled by the Rogers estate, and as soon as the executors deem it expedient, you are to be elected a director and the chairman of the board of the Virginian Railway Company. It is the intention of the executors, as soon thereafter as they can bring it about, to elect you president of the company. Your office in connection with these companies, is to be on the third floor of the City Bank Building.

"Referring to my letter to you of February 7, 1913, in which I requested you to take up some special matters for the Rogers estate, and to the conversation had with you this day, in which you kindly expressed the desire not to charge anything for the service you performed under the terms of the said letter, I beg to say that, while I thank you for this consideration, it would seem to me only fair under all the circumstances, that, in order to cover such services, the $25,000 salary hereinbefore mentioned should begin 15 days earlier than June 1st next, viz. on May 15, 1913; it being understood that the extra compensation which you will thus receive will be in full of anything you may have earned under the terms of my letter of February 7, 1913. Of course, your disbursements will be paid upon the presentation of your bill therefor.

"Yours sincerely,                                         John W. Sterling.

"P. S.—In reading over the foregoing, I notice that I have not very accurately stated the source from which your salary will be paid. What I had expected to say on this subject was that the executors will apportion your salary between the three electric railway companies, the Virginian Railway Company, and perhaps some other companies, in such manner as they may, from time to time, think reasonable and proper. This, I understand, will be perfectly satisfactory to you.                                 J. W. S."

                                                        "June 6, 1913.

"John W. Sterling, Esquire, 55 Wall Street, New York—Dear Mr. Sterling: Yours of May 22d, last, expresses accurately my understanding of the arrangement theretofore made between us. If a formal acceptance of your offer be thought necessary, you may consider me, by this writing, as approving and accepting all the terms of the proposition contained in your letter above referred to.

"Very truly yours,                            Charles W. Hotchkiss."

Plaintiffs alleged that Hotchkiss, on June 1, 1913, under the terms stated in the Sterling letter, entered the service of plaintiffs at a salary of $25,000 per year, and continued in such service at that rate until May 1, 1915; that on or about that date, and continuing to act under the terms of the Sterling letter, he notified two of plaintiffs' directors that he had terminated his employment with the utility companies, and, effective May 1, 1915, had himself put on plaintiffs' pay rolls for an additional sum, increasing his annual salary from plaintiffs to $50,000. Plaintiffs further claim that he had not terminated his employment with the utility companies, but that he continued to draw a salary of $25,000 per year until the time of his death, rendering substantially the same service to the utility companies as before. Plaintiffs recovered on the theory that defendants should account for the salary received by Hotchkiss from the utility companies after he began drawing $50,000 per year from plaintiffs.

There is no controversy about the amount of money received by Hotchkiss from plaintiffs, but it is claimed that it was not received under the terms of the Sterling letter. Nor is it disputed that Hotchkiss got the amount of money, as charged, from the utility companies after the $50,000 salary from plaintiffs commenced; but it is claimed that he received it as advance of commissions on a prospective sale under his contract, and that, after plaintiffs commenced paying him $50,000, he did nothing for the utility companies except to try to make a sale, with the knowledge and consent of plaintiffs.

The record shows that, after Hotchkiss' salary from the utility companies was reduced one-half, with the right to take other employment, he entered into the service of plaintiff corporations, and was elected to the offices and received the salary, all as specified in the Sterling let-

ter. In 1915 he told Hyams and Sterling, both directors of one of plaintiffs, that he had severed his connection with the utility companies and was then ready to devote all his time to plaintiffs' affairs. By his own order he placed himself on the pay rolls of some of plaintiffs for an additional amount that made his salary equal the $50,000 per year specified in the Sterling letter. He told Hyams and Sterling that he had his name kept on the pay rolls of the utility companies at $100 per month, so that he could keep track of what they were doing and get his commissions if a sale was made of the properties. On May 24, 1915, he wrote Tracy, treasurer of the utility companies, to send him no more than $100 per month of his salary, and for three months received only that amount.

It was not true that he had severed his connections with the utility companies. He had opened negotiations to do so, but, because he was advised that he could not keep his contract alive and get commissions in case of a sale unless he retained his salary, all offers were withdrawn in July, 1915, and two weeks later Hotchkiss again wrote Tracy to send him from that time all his salary and to include what had been withheld for the three months. That was done, and from then until his death, October 28, 1916, he received at the rate of $25,000 per year. None of those matters was ever disclosed to Sterling or Hyams or to plaintiffs. On one or more occasions he told Hyams or Sterling that they, the utility companies, kept bothering him about things; but, instead of disclosing the fact that they had the right to bother him, he gave Hyams to understand that he only answered the inquiries because he did not want to seem ungracious. The evidence fully supports the finding of the master and of the District Court that Hotchkiss' services to plaintiffs were rendered under the terms of the Sterling letter, and that he received from plaintiffs the $50,000 salary upon the condition and understanding that he would devote his entire time to the service of plaintiffs. The evidence also very clearly supports the finding that the money from the utility companies was received by Hotchkiss as salary.

[1] Although it was stricken from the record by the master, we have considered the testimony given by defendants' attorneys. The situation that brought about the opportunity for the attorneys to testify was created by themselves. They went to Sterling for the purpose of getting information that would assist them in the prosecution of defendants' claim for commission. While their testimony shows that Sterling knew that Hotchkiss had been doing some things to bring about a sale and get a commission therefor from the utility companies, it also shows that Sterling did not know that Hotchkiss had not severed his connection with the utility companies, or that Hotchkiss had terminated all negotiations theretofore pending for the cancellation of his contract with the utility companies, or that Hotchkiss was continuing to serve the utility companies substantially as he had before and was receiving the salary which he said he had given up. When Sterling found out what Hotchkiss had been doing, he immediately wrote the attorneys that whatever sum Hotchkiss had drawn from the utility companies should be turned over to plaintiffs. The attorneys

and defendant Riley, after they heard that plaintiffs intended to make a claim for the salary taken from the utility companies, went to see Hyams for the express purpose of trying to convince him that plaintiffs had no legitimate claim against the Hotchkiss estate. There seems to have been an open discussion between them for the purpose of compromise. It is a much better practice, if attorneys wish to testify, except as to merely formal matters, that they withdraw as attorneys from the case.

It is urged, in defense, that McRoberts, a director of plaintiffs, had knowledge of what Hotchkiss was doing for the utility companies. McRoberts was also a director for the utility companies, and it does not appear that he had any information even equaling that of Sterling and Hyams. The record merely says that on a certain day Hotchkiss went to see McRoberts about "Chicago situation," not "Chicago utilities," as stated in the argument. Knight, general counsel for plaintiffs, is one of the persons because of whose knowledge it is claimed plaintiffs should be bound. All that appears about Knight is that he went from New York towards Washington one day on the same train with Hotchkiss. It is also urged that, if those persons did not have full knowledge of what Hotchkiss was doing, they had an opportunity, and it was their duty, as directors of plaintiff corporations, to learn what he was doing, and that plaintiffs are bound by what they might have known. The cases cited support such a proposition as between a corporation seeking to avoid responsibility for the acts of an agent affecting a third party, but we are not referred to any case supporting the proposition that the wrongdoer may himself find shelter behind the fact that the person wronged might, by diligence, have protected himself.

Defendants urge that, even though Hotchkiss was employed to give all his time to plaintiffs, yet that he was not precluded from accepting the employment and pay in question, because defendants say such a contract is merely exclusive in respect to the period during which it is understood the servant is to hold himself in readiness for the performance of his duties, citing 5 Labatt, Master & Servant (2d Ed.) § 2037. This theory is accepted by defendants as the true one, and they reject the other theory, also stated by Labatt, that a servant who contracts to give all his time to the master has no legal or moral right to give any time to any other business. Jackson v. Seevers, 115 Iowa, 370, 88 N. W. 931. The cases cited by defendants are not persuasive. They are based largely upon custom and usage in connection with small business affairs. That they are not in point becomes more apparent when we read further from Labatt (reference, supra):

"When considered with relation to the circumstances that, in most kinds of occupations, it is understood that employees are expected to work for a definite portion of the day only, a stipulation of this character becomes susceptible of two constructions. It would seem to be not unreasonable, therefore, to take the position that a servant should not be saddled with the consequences of an arrangement so onerous as one which involves a total surrender of his earning capacity, *unless his intention in that regard has been expressed in clear and unambiguous language, or the nature of the employment is such that he may fairly be presumed to have agreed to such a surrender.*" (The italics are ours.)

Hotchkiss had employment for his full time at $50,000 per year with the utility companies. He reduced that time and that salary one-half, in order that he might get employment for one-half of his time with plaintiffs and receive from them a salary equal to the reduction. At the same time, he contracted for a salary of $50,000 per year to be paid by plaintiffs, but it was not to begin until his salary from the utility companies had wholly ceased, and when he was in a position to give his entire time to plaintiffs. Hotchkiss' contract to give his whole time to plaintiffs was clear and explicit.

[2] Hotchkiss was not employed by plaintiffs in a small undertaking, with fixed hours and fixed duties, but he was employed as an executive of four large corporations, with business of such a character that they were willing to pay him for his entire time $50,000 per year. The entire time of Hotchkiss under the employment meant his entire capacity in mental attainments and experience. In Sheppard Pub. Co. v. Harkins, 9 Ontario, 504, 508, cited by defendants, it is said:

"The covenant of an employee to devote his entire time to the undertaking of his employer must, moreover, receive a reasonable construction. It cannot, for instance, be deemed to require that the employee should give to the service hours of the day or night usually devoted to rest and recreation."

It is equally true that the employer has the right to demand that the employee shall not, by engaging in other employment, either mentally or physically impair his ability to give the best service of which he is capable. Referring to the employee's covenant, the court in that same case said:

"It does impose upon him an obligation to employ diligently, in advancing that undertaking or business of his principal to which he has agreed to devote himself, during such hours as it is customary for men in positions such as his to work, all the time and ability he can bestow advantageously to his principal."

It is inconceivable that Hotchkiss could render the large service to the utility companies, as shown by the evidence, without causing him very considerable mental and physical exhaustion, or without the use of time belonging to plaintiffs.

It is finally urged that there is here no showing of a breach of trust, but only a breach of contract, and that there is that absence of fraud necessary to entitle the plaintiffs to recover. The receipt by Hotchkiss for his services of a salary of $25,000 a year from the utility companies, when the plaintiffs believed that he was not receiving any salary at all in excess of $100 per month, and the withdrawal of all negotiations for the cancellation of his contract with the utility companies after he had notified plaintiffs that he had severed his relations with the utility companies, without advising plaintiffs or any one for them that the situation as stated to Sterling and Hyams was no longer true, under the circumstances was a fraud upon the plaintiffs. The situation with Hotchkiss was novel. He was the executive head of plaintiff corporations, with no one over him who could measure what he could do, or the damage that would ensue because of any failure on his part to fully use his mental capacity and experience. Plaintiffs were wholly dependent upon his honor and fidelity. Because

of conditions created by Hotchkiss, the only possible measure of damages open to plaintiffs was to recover his earnings made in fraud of plaintiffs' rights.

The arguments chiefly relied upon in this connection are those advanced in the Sheppard Pub. Co. Case, supra, and we are of opinion that that case does not support defendants' contention. The court there said:

"As money obtained by the servant by the sale of time and labor which belonged to his master, and therefore, in contemplation of law, the proceeds of the master's property, his right to follow and demand them may be upheld. Taylor v. Plumber (1815) 3 M. & S. 562. I am bound, I think, to hold profits so made by a servant to be in his hands the property of his master, for which the servant must account to him."

Many early cases to the same effect are there cited.

[3] The contention that Hotchkiss did no more than to breach his contract, and therefore there could only be a recovery in an action at law for such actual damages as might be shown, is not based upon the facts nor any sound proposition of law. The relation between Hotchkiss and plaintiffs was a fiduciary one, requiring the highest fidelity on his part. It is conceded that, if property having physical existence had been confided to Hotchkiss to be used for plaintiffs' benefit, then plaintiffs might follow the property or have the profits, if the trust was violated. It, then, would be a monstrous doctrine that an executive of a corporation, being by the very nature of his employment the custodian of his own time and abilities for the benefit of the master, may, nevertheless, use that time and those abilities to make large earnings for himself and leave the master no recourse except the recovery of such actual damages as the master may be able to show necessarily followed from such double dealing. Speaking of a "fiduciary relation," Bouvier says:

"It has been held to apply to all persons who occupy a position of peculiar confidence towards others, such as a trustee, executor, administrator, or directors of a corporation or society."

In Beach v. Wilton, 244 Ill. 413, at page 422, 91 N. E. 492, at page 495, the court said:

"In Pomeroy's Equity Jurisprudence, vol. 2 (3d. Ed.) § 956, that author, in discussing this question, says: 'Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is a confidence reposed on one side and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal. It may be moral, social, domestic, or merely personal.'"

See, also, Hensan v. Cooksey, 237 Ill. 620, 626, 86 N. E. 1107, 127 Am. St. Rep. 345.

The District Court, on the equity side, had jurisdiction of this case. In Waterman v. Canal-Louisiana Bank Co., 215 U. S. 33, at page 43, 30 Sup. Ct. 10, at page 12 (54 L. Ed. 80), the court said:

"This court has uniformly maintained the right of federal courts of chancery to exercise original jurisdiction * * * in favor of creditors, legatees

and heirs, to establish their claims and have a proper execution of the trust as to them. [Citing numerous cases.]"

In Walden v. Bodley, 14 Pet. 156, page 164 (10 L. Ed. 398), it is said:

"It is true, the answer prays merely for a dissolution of the injunction, and that the bill may be dismissed. But the court have, by the bill, answer and evidence, the equities of the parties before them; and having jurisdiction of the main points, they may settle the whole matter. * * * Under the general prayer for relief, the court will often extend relief beyond the specific prayer, and not exactly in accordance with it."

See, also, Lockhart v. Leeds, 195 U. S. 427, 437, 25 Sup. Ct. 76, 49 L. Ed. 263.

The decree is affirmed.