POTTER *v.* LINDSAY.

1. TRUSTS—RESULTING TRUST—DISPOSITION OF BENEFICIAL INTEREST.
    A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein and where the inference is not rebutted and the beneficial interest is not otherwise effectively disposed of; the beneficial interest resulting to the person who made the disposition, or to his estate.

2. SAME—RESULTING TRUST—BONDS—JOINT NAMES.
    Resulting trust in favor of estate of deceased woman did not arise as to bonds which the decedent had caused to be placed in the joint names of herself and defendant, a niece of her late husband, where decedent had not parted with her interest in the bonds during her lifetime, kept them in her possession and could have disposed of them at any time prior to her death, and expressly declared her intention that defendant have the remaining bonds at her death.

3. SAME—CONSTRUCTIVE TRUSTS—EQUITY—FRAUD.
    Equity will impress a constructive trust on property and turn it over to the one to whom it rightfully belongs where it is shown that title has been obtained through fraud, misrepresentation, concealment, undue influence, duress, taking advantage of one's weakness, or necessities, or any other similar

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 54 Am Jur, Trusts § 193 *et seq.*
[3, 4] 54 Am Jur, Trusts § 218.
[5, 7, 8] 54 Am Jur, Trusts §§ 225, 226.
[6, 9] 54 Am Jur, Trusts § 219.

circumstances which render it unconscionable for the holder of the legal title to retain and enjoy the property and there are no intervening rights of bona fide purchasers.

4. SAME—CONSTRUCTIVE TRUSTS—FRAUD.

Constructive trusts are not created by any words but arise purely by construction of equity independently of any actual or presumed intention of the parties to create a trust and are generally thrust on the trustee for the purpose of working out the remedy and are said to arise from actual fraud, constructive fraud and from some equitable principle independent of the existence of any fraud.

5. SAME—CONSTRUCTIVE TRUST—DEFINITION OF FIDUCIARY.

The term "fiduciary" or "confidential relation", when concerned in a situation involving an alleged constructive trust, is a very broad one and embraces cases in which influence has been acquired and abused, wherein a confidence has been reposed and betrayed.

6. SAME—CONSTRUCTIVE TRUST—UNJUST ENRICHMENT.

A constructive trust is remedial in character and is not imposed because of the intention of the parties but because the person holding the title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property.

7. SAME—CONSTRUCTIVE TRUSTS—TITLE.

Fraud, accident, or mistake in the procurement or creation of the legal title, by which the title which should have been taken to the equitable claimant was taken by the alleged trustee, gives rise to a constructive trust in favor of the former.

8. SAME—TRUST EX MALEFICIO.

A trust may arise *ex maleficio,* in which equity turns the fraudulent procurer of the legal title into a trustee to get at him.

9. SAME—CONSTRUCTIVE TRUSTS—EVIDENCE.

Trial court's findings that defendant, niece of decedent's late husband, did not obtain title to bonds by reason of any undue influence upon decedent, if there may be said to be a confidential or fiduciary relationship between them as next door neighbors, and that decedent intended, by placing the bonds in the joint names of herself and defendant, that defendant should have the bonds after the death of decedent, *held,* proper, where decedent herself had received them by reason of survivorship, hence there was no basis for claiming unjust enrichment or unmerited reward as ground for a constructive trust.

Appeal from Wayne; Webster (Arthur), J. Submitted June 2, 1953. (Docket No. 14, Calendar No. 45,792.) Decided October 5, 1953.

Bill by John L. Potter, administrator of the estate of Mabel Miller, deceased, against Katherine Lindsay to have constructive trust enforced. Decree for defendant. Plaintiff appeals. Affirmed.

*Joseph A. Luyckx* and *Edward F. Frohlich,* for plaintiff.

*Ellis C. Wood* and *R. Gerveys Grylls,* for defendant.

SHARPE, J. Plaintiff, John L. Potter, as administrator of the estate of Mabel Miller, deceased, filed a bill of complaint in the circuit court of Wayne county to reach certain bonds in the possession of defendant, Katherine Lindsay. The essential facts which gave rise to this action are as follows: Hugh Miller was engaged in the carpeting and furniture business. In 1943 he sold his business, and died June 4, 1950. During his lifetime he accumulated considerable property including $40,000 in United States war savings bonds. Mr. Miller's wife, Mabel Miller, had little experience in matters of business and did not participate in his business affairs until the last few months of his life when he was confined to the hospital. At the time of his death, Mr. and Mrs. Miller jointly owned $24,000 in United States war savings bonds. Mr. Miller left an estate consisting of a vendor's interest in a land contract on a home on West Euclid in Detroit; an automobile; a bank account; and approximately $10,000 in life insurance. Katherine Lindsay, the defendant, was the niece of Hugh Miller. She and her husband came to Detroit in about 1945 and rented a house next

door to the Millers.  Prior to Mr. Miller's death a strained relationship existed between Katherine Lindsay and Hugh Miller, but during Mr. Miller's illness Katherine Lindsay began to advise Mrs. Miller on business affairs.  After Mr. Miller's death, Katherine Lindsay accompanied Mrs. Miller to the hearings in the probate court in respect to Mr. Miller's estate.  She was present at the opening of the safety deposit box when the bonds were inventoried.  Thereafter, she was often at the Miller home and drove Mrs. Miller on business errands.  On or about June 26 or 27, 1950, Mrs. Miller appeared at the National Bank of Detroit and caused the bonds to be re-issued in the names of Mabel Miller and Katherine Lindsay under a joint designation.  Mabel Miller died intestate on January 2, 1951, at Detroit. The assets in her estate were a vendor's interest in a land contract amounting to $2,444.10; $450 due on sale of automobile; cash in an amount of $574.76; a bank account in the amount of $910.62; and other items of the value of approximately $250.    The cause came on for trial, and at its conclusion the trial court entered a decree dismissing plaintiff's bill of complaint.

Plaintiff appeals and urges:

"That the fact that plaintiff's deceased furnished the full consideration for the bonds involved here caused the transaction of June 26, 1950, or thereabouts, to effect a resulting trust under which the beneficial title to the bonds passed to plaintiff's decedent or her personal representative upon her death.  Further, that since the transaction was between parties who were not related by blood and were in a situation in which the payor had no duty or responsibility to the defendant, the legal inference or presumption was that such resulting trust was effected and that the burden was on the defendant to prove otherwise."

Other facts bearing upon the issues involved in this case are as follows: Mrs. Miller's relatives and heirs-at-law are Ethel Potter, Helen O'Neill, Lillian McGee, Warren Thompson and May Thompson. Mrs. Miller was on friendly terms with her relatives and often visited with them. The Millers and the Thompsons spent many Sundays together. At the trial Mrs. George Peppard was called as a witness on behalf of the defendant. She testified:

"My husband, during his lifetime, knew the Millers for about 35–40 years. Our relationship was a close social acquaintance. To some extent my husband and Mrs. Miller discussed business. I have heard Mr. and Mrs. Miller mention Katherine Lindsay repeatedly.

"Katherine Lindsay was placed next to the Millers to be able to help to take care of them in small ways as she did until Mr. Miller's death and then she was very close to Mrs. Miller in helping to care for her, driving the car for her, helping at the house many times and looking out for the welfare of Mrs. Miller. I do not know Katherine Lindsay but I do know the Millers depended on her for these many services. In Hugh Miller's last illness at his home he said 'Mabel will be all right. Katherine will be here to look after her.' Mabel Miller asked business advice of both my husband and me. Before the bonds were re-issued she told my husband and me that she wished to have them in a joint account with Hugh's niece Katherine Lindsay. Mrs. Miller consulted Mr. Peppard with relation to the repurchase of her home. I cannot say whether or not Mabel Miller helped May Thompson with her bills when she was ill. She discussed with me the sale of her car to Warren Thompson.

"Mrs. Miller knew Mr. Miller would be going because he had many heart attacks and she was prepared to take over any business that she needed· to.

"Mrs. Miller asked my husband's advice about making a loan, which he advised against, that she did not have that much money that she could afford to loan out her moneys. She was able to conduct her own business. Mr. Miller discussed many questions of his business with his wife in our presence. We talked of business a great deal and especially in Mr. Miller's last illnesses. During those discussions Mr. Miller did not outline a procedure or practice of banking to Mrs. Miller, he did not need to do that. Mrs. Miller was capable of doing those things. I understand Mr. Miller died of heart trouble and Mrs. Miller died of a heart condition.

"Mrs. Miller did not mention a will that she intended to make. She did say that her bonds would be left in a joint account with Katherine Lindsay. This conversation about the bonds was before the re-issue. She did not tell me after that that she had done so.

"I heard no complaint against Katherine Lindsay. I heard only that she was gracious and kind to her and that she needed her. Mrs. Lindsay drove Mrs. Miller while they had the car. After that when I would ask her to come to my home or downtown she would say 'I do not have a car and you will have to come and get me to do so.' She did not drive a car.    *    *    *

"About 6 weeks after Hugh Miller died, she discussed with my husband and me the advisability of changing the ownership form of the bonds to joint names so they would be there in case anything happened to her. I remember saying distinctly, 'There is nothing wrong with you, you have years of living' and George, my husband said, 'How do you know.' The advisability of putting them in a joint account was so that Katherine could have them if she did not live. That was the conversation.    *    *    *

"There was no discussion about her bank account. She gave as her reason for the bonds being in joint names that she (Mrs. Lindsay) was the niece what was the closest to her, she was kind and gracious

to them. Mrs. Miller said that Hugh Miller, almost on his death bed, said 'Katherine will take care of Mabel.' Mrs. Miller said of Katherine 'She has been a great comfort to us.' Mr. Miller wanted Mrs. Lindsay next door in that house to be near them to help in any way, to be near Mabel, near the household, in case they needed her."

In 2 Restatement, Trusts, pp 1244, 1245, it defines a resulting trust in the following language:

"A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein and where the inference is not rebutted and the beneficial interest is not otherwise effectively disposed of. Since the person who holds the property is not entitled to the beneficial interest, and since the beneficial interest is not otherwise disposed of, it springs back or results to the person who made the disposition or to his estate, and the person holding the property holds it upon a resulting trust for him or his estate."

In the case at bar, the facts show that Mrs. Miller did not part with her interest in the bonds as she kept them in her possession and could dispose of them at any time prior to her death. Moreover, she expressly declared her intention that Katherine Lindsay have the remaining bonds at her death. In our opinion, the facts and circumstances in this case do not give rise to a situation where a resulting trust should be imposed upon the bonds in favor of plaintiff.

Plaintiff also urges that in the event a resulting trust is not imposed upon the bonds:

"That the circumstances surrounding the transaction of June 26, 1950, or thereabouts, were such that the element of constructive fraud, taking advantage

of weakness, abuse of confidential and fiduciary relationship and questionable means were actually or constructively present and that the result of the transaction was to effect an unmerited reward and unjust enrichment to the defendant and that consequently equity and good conscience required that a constructive trust should be imposed upon the transaction."

In *Racho* v. *Beach,* 254 Mich 600, 606, we said:

"However, when it is shown that title has been obtained through fraud, misrepresentation, concealment, undue influence, duress, taking advantage of one's weakness, or necessities, or any other similar circumstances which render it unconscionable for the holder of the legal title to retain and enjoy the property, and there are no intervening rights of bona fide purchasers, equity will impress a constructive trust on the property and turn it over to the one to whom it rightfully belongs."

The basis for constructive trusts was further enlarged by language of this Court in *Stephenson* v. *Golden,* 279 Mich 710, 738, 739, 742, 744, 745, wherein it was said:

" 'Constructive trusts arise purely by construction of equity independently of any actual or presumed intention of the parties to create a trust and are generally thrust on the trustee for the purpose of working out the remedy. They are said to arise from actual fraud, constructive fraud and from some equitable principle independent of the existence of any fraud.' *Quinn* v. *Phipps,* 93 Fla 805, 813 (113 S 419, 54 ALR 1173), citing 26 RCL, p 1232.

" 'The term "fiduciary" or "confidential" relation, * * * is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused—in which confidence has been reposed and betrayed.' * * * *Beach* v. *Wilton,* 244 Ill 413 (91 NE 492). * * *

" 'The term "constructive trust" * * * has been variously defined as a trust not created by any words, either expressly or impliedly evincing a direct intention to create a trust, but by the construction of equity in order to satisfy the demands of justice.' * * * 65 CJ, pp 223, 225. * * *

" 'A constructive trust is imposed not because of the intention of the parties but because the person holding the title to property would profit by a wrong or would be unjustly enriched if he were permitted to keep the property. A constructive trust * * * is remedial in character.' 2 Restatement, Trusts, p 1249. * * *

" 'Fraud, accident, or mistake in the procurement or creation of the legal title, by which the title which should have been taken to the equitable claimant was taken by the alleged trustee, gives rise to a constructive trust in favor of the former.' 3 Reed on Statute of Frauds (1st ed), § 927, p 31. * * *

" 'A trust may arise *ex maleficio,* in which equity turns the fraudulent procurer of the legal title into a trustee to get at him.' * * * Waterman, Specific Performance (1st ed), § 251, p 341.

" 'If one takes a title in his own name, whilst acting as agent, trustee or guardian, or in any other fiduciary capacity, a court of equity will * * * subject the lands to proper trusts in his hands or compel him to transfer the title to the party equitably entitled to it. Nor does it matter whether the party takes the title in his own name in good faith, under the belief that he can thereby better manage the property to the advantage of those for whom he is acting, or in compliance with their wishes, or whether from an intention to defraud them of their rights therein. In either case a court of equity will control the legal title so as to protect the just rights of the true owner.' * * * *Sanford* v. *Sanford,* 139 US 642 (11 S Ct 666, 35 L ed 290).' "

In the case at bar, a search of the record fails to disclose any act or statement upon the part of

Mrs. Miller to create a trust. On the contrary, she clearly expressed her intention that Katherine Lindsay should have the bonds after her death. We are in accord with the following findings of facts and conclusions of law of the trial court:

"The intent of Mrs. Miller is the decisive point in this whole controversy.

"During her life Mrs. Miller had control of the bonds. Mrs. Lindsay could not do anything with the bonds herself. This protected Mrs. Miller at all times. Because Mrs. Miller got the bonds by reason of survivorship she certainly knew the consequences of the bonds being in both names.

"Having reached this conclusion about the transfer itself, it is my opinion the question of resulting or constructive trust or unjust enrichment cannot enter into the decision. If a party competent to make a contract or agreement enters into the contract with full knowledge of the consequences and with an intention to be bound by her act, then a court of equity has no power to set it aside. Equity follows the law. Equity enforces a legal contract. This being true, plaintiff cannot claim unjust enrichment or unmerited reward as a ground for a constructive trust.

"In my opinion there is no evidence of direct fraud or of an act of undue influence. If there may be said to be something approaching a confidential or fiduciary relationship there is no proof that the defendant took advantage of the deceased."

The decree dismissing the bill of complaint is affirmed, with costs to defendant.

DETHMERS, C. J., and ADAMS, BUTZEL, CARR, BUSHNELL, and REID, JJ., concurred.

BOYLES, J., did not sit.